[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 09-15428

_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 30, 2011
JOHN LEY
CLERK

D. C. Docket No. 06-01774-CV-BBM-1

WILLIAM SMITH, et al.,

Plaintiffs,

ANTHONY MITTEN,

Plaintiff-Appellant,

versus

LOCKHEED-MARTIN CORPORATION,
d.b.a. Lockhead-Martin Aeronautics
Company,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(June 30, 2011)

Before TJOFLAT, CARNES and REAVLEY,[*] Circuit Judges.

TJOFLAT, Circuit Judge:

In this "reverse" discrimination case under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., and 42 U.S.C. § 1981, Anthony Mitten, a white male, claims that his former employer, Lockheed-Martin Aeronautics Company ("Lockheed"),[1] discriminated against him on account of his race in terminating his employment. The district court granted Lockheed summary judgment, and Mitten appealed. Our task, consequently, is to determine whether the district court misapplied the summary judgment standard to the evidence presented. Holding that it did, we vacate the district court's judgment and remand the case for further proceedings.

I.

A.

Lockheed prohibits workplace discrimination and harassment under a

---

[*] Honorable Thomas M. Reavley, United States Circuit Judge for the Fifth Circuit, sitting by designation.

[1] Lockheed, which designs and manufactures military aircrafts, is a subsidiary of Lockheed-Martin Corporation, a Maryland corporation with its principal place of business in Bethesda, Maryland. Lockheed is one of Lockheed-Martin Corporation's four core business units. Lockheed is headquartered in Fort Worth, Texas and has additional locations in Palmdale, California; Pinellas Park, Florida; Marietta, Georgia; Meridian, Mississippi; Johnstown, Pennsylvania; Greenville, South Carolina; and Clarksburg, West Virginia. In 2005, when Mitten was fired, Lockheed had approximately 26,000 employees.

workplace-conduct rule it calls its "zero tolerance policy." The zero tolerance policy provides notice to employees that Lockheed's department of Human Resources ("HR") will discipline anyone who, at work, engages in an act of discriminatory "harassment[2] based on a legally protected status such as race . . . when it has the effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile or offensive work environment." This includes using Lockheed email accounts "in ways that are disruptive, abusive, obscene, or degrading, or offensive to others," such as the distribution or "transmission of ethnic slurs or racial comments." (Emphasis added).[3]

HR frequently learns of violations of the zero tolerance policy through employees, as Lockheed requires its employees to aid HR in policing the workplace-conduct rule. The expectations placed on employees vary based on their employment rank. Employees having no supervisory responsibilities ("non-supervisors"), for instance, must ensure only their own compliance with the policy and inform their supervisors or HR whenever they discover a violation. Those

---

[2] Discriminatory harassment is defined under the zero tolerance policy to include an employee's use of "racial slurs, ethnic jokes, sexual or lewd jokes, negative or derogatory stereotypes, names, or labels that a reasonable person would find offensive."

[3] Therefore, if an employee receives, on the employee's Lockheed email account, an email containing racially insensitive content, the employee violates the zero tolerance policy if the employee subsequently "transmits" the harassing email—through electronic forwarding or any other form of distribution.

with supervisory responsibilities ("supervisors"), however, must be more proactive,[4] including "[r]eport[ing] promptly to [HR] any act of harassment which is personally witnessed or suspected or reported by [an] employee."

Once HR learns of a possible infraction of the zero tolerance policy, it initiates an investigation. If its investigation concludes that an employee breached the zero tolerance policy, HR, through an empaneled disciplinary review committee, fashions discipline, up to and including termination.

It is against this background that Mitten's case arises.

B.

On March 29, 2005, Mitten, then a supervisor at Lockheed's plant in Marietta, Georgia,[5] received a racially insensitive "joke" email.[6] The email, entitled "Top Ten Reasons Why There are No Black NASCAR Drivers" (the "NASCAR email"), featured a top-ten list of derogatory stereotypes, all of which portrayed black people as criminals, pimps, and gang members. Two of the list's

---

[4] For example, supervisors must: (1) "[m]aintain an atmosphere free of harassment"; (2) "ensure that work areas are free of explicit and implicit conduct that would violate th[e] [zero tolerance] policy"; and (3) "[t]ake immediate action to address reported, observed, or suspected" threats to workplace security, such as acts of "harassment" and acts that create a "hostile and intimidating work environment."

[5] Mitten's job title was Associate Manager; he had worked for Lockheed for 11 years.

[6] Michael Porterfield, an hourly employee, sent the email to Mitten. Porterfield was not attempting to report the email, as required by the zero tolerance policy, by sending it to Mitten as a supervisor. Instead, Porterfield and Mitten were friends, and Porterfield believed that Mitten would find the email humorous.

entries, as illustration, claimed there are no blacks in NASCAR racing because a "[p]istol won't stay under the front seat" and because there is "[n]o passenger seat for the ho."

After Mitten received the NASCAR email, he transmitted it in violation of the zero tolerance policy by forwarding it to his supervisor.[7] He did not report any of this to HR. HR, however, learned of Mitten's actions and, following an investigation, fired Mitten on May 5, 2005.

Mitten later learned that, within two months of his termination, HR discovered that two black non-supervisors at the Marietta plant had also violated the zero tolerance policy by transmitting racist emails targeting whites. These black employees, however, merely received temporary suspensions as discipline for their conduct.

After learning of this more-lenient treatment for black employees, Mitten concluded that he had been fired—in lieu of a temporary suspension—because he is white.

II.

---

[7] As discussed in part III.A.3.b, infra, although Mitten forwarded the email to his supervisor, he, like Porterfield , did so only to share it with the supervisor as a friend, not to report the email, as the zero tolerance policy required.

Mitten brought this lawsuit against Lockheed on July 28, 2006,[8] in the United States District Court for the Northern District of Georgia.[9] The complaint, was framed in two counts: the first under Title VII of the Civil Rights Act of 1964,[10] and the second under 42 U.S.C. § 1981.[11] Both counts alleged that Lockheed terminated Mitten's employment due to his race and, as remedy for the wrong, sought reinstatement, back pay, and compensatory and punitive damages.[12] Lockheed answered the complaint, denied liability, and, after discovery closed, moved the district court for summary judgment. The court referred Lockheed's motion to a magistrate judge, who issued a report recommending that the motion be granted.[13] The magistrate judge—and later the district court—rejected Mitten's

---

[8] Four other white former Lockheed employees fired for distributing the NASCAR email—Herbert Gann, William Smith, James Nichols, and Martin Yerby—joined Mitten as plaintiffs; only Mitten's appeal is currently before us. Therefore, we treat Mitten as if he were the sole plaintiff and indicate in footnotes the dispositions of his co-plaintiffs' claims.

[9] Mitten and his co-plaintiffs each separately exhausted his administrative remedies before filing suit. On October 21, 2005, Mitten filed charges of race discrimination with the Equal Employment Opportunity Commission ("EEOC"), and, on April 27, 2006, the EEOC mailed him notice of his right to sue.

[10] See 42 U.S.C. § 2000e-2(a)(1) (declaring it unlawful for an employer "to discharge any individual . . . because of such individual's race").

[11] See 42 U.S.C. § 1981(a)–(b) (protecting an individual's right to be free from racial discrimination in the "making, performance, modification, enforcement, and termination" of contracts).

[12] The complaint also sought attorneys' fees.

[13] The magistrate judge also recommended that the district court grant Lockheed summary judgment on Gann's and Smith's claims, but not on Yerby's and Nichols's.

6

claim of race discrimination after analyzing it under the three-step burden-shifting framework established by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05, 93 S. Ct. 1817, 1824–26, 36 L. Ed. 2d 668 (1973).[14]

The first step of the McDonnell Douglas framework requires the plaintiff to make out a case sufficient to withstand a motion for summary judgment (or a motion for judgment as a matter of law)—i.e., a "prima facie case." When, as here, the plaintiff claims that his employer discharged him on account of his race, he must establish four elements: (1) that he is a member of a protected class (here, Caucasian[15]); (2) that he was qualified for the position he held; (3) that he was discharged from that position; and (4) that in terminating his employment, his employer treated him less favorably than a similarly situated individual outside of

[14] Title VII and § 1981 have the same requirements of proof and utilize the same analytical framework. See Brown v. Am. Honda Motor Co., 939 F.2d 946, 949 (11th Cir. 1991) ("The Supreme Court has held that the test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment causes." (citing Patterson v. McLean Credit Union, 491 U.S. 164, 185–87, 109 S. Ct. 2363, 2377–78, 105 L. Ed. 2d 132 (1989))).

[15] We note that, in "reverse" discrimination cases like this one, some circuits, in applying the framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973), require majority-member plaintiffs to establish that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." Parker v. Balt. & Ohio R.R. Co., 652 F.2d 1012, 1017 (D.C. Cir. 1981) (emphasis added). We, however, have rejected a background circumstances requirement. See Bass v. Bd. of Cnty. Comm'rs, 256 F.3d 1095, 1102–03 (11th Cir. 2001), overruled in part on other grounds by Crawford v. Carroll, 529 F.3d 961 (11th Cir. 2008) ("Discrimination is discrimination no matter what the race, color, religion, sex, or national origin of the victim.").

his protected class (here, an African-American).[16]  E.g., Maynard v. Bd. of

Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) (citing McDonnell Douglas, 411

U.S. at 802, 93 S. Ct. at 1824).  If the plaintiff makes this showing, he raises a

presumption that his race motivated his employer to treat him unfavorably.  See

Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094,

67 L. Ed. 2d 207 (1981).

Once this presumption is raised, "[t]he burden then shifts to the employer to

rebut [it] by producing evidence that [the employer's] action was taken for some

legitimate, non-discriminatory reason."  EEOC v. Joe's Stone Crabs, Inc., 296 F.3d

1265, 1272 (11th Cir. 2002) (citing Burdine, 450 U.S. at 254–55, 101 S. Ct. at

1094).  If the employer meets its burden of production, the presumption of

discrimination raised by the plaintiff's prima facie case is rebutted and thus

disappears.

Once the presumption of discrimination is rebutted, the inquiry "'proceeds to

a new level of specificity,'" whereby the plaintiff must show the employer's

proffered reason to be a pretext for unlawful discrimination.  Id. at 1272–73 (citing

Burdine, 450 U.S. at 255–56, 101 S. Ct. at 1095–96).  It is at this stage that the

---

[16]  In most cases, the second and third elements are a given: the plaintiff was qualified for
the position he held and was discharged.  Here, Lockheed admitted that those two elements had
been established.  (Clearly, since all races are protected, there was no question that the first
element, too, was satisfied.)

plaintiff's "burden . . . merges with the ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Burdine, 450 U.S. at 256, 101 S. Ct. at 1095. Thus, if a jury reasonably could infer from the evidence presented that the employer's legitimate justification is pretextual, the question becomes whether the evidence, considered in the light most favorable to the plaintiff, yields the reasonable inference that the employer engaged in the alleged discrimination. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 146–48, 120 S. Ct. 2097, 2108–09, 147 L. Ed. 2d 105 (2000) (explaining that, depending on the facts of the case, the jury may, but need not, infer discriminatory intent from a plaintiff's showing of pretext). If such an inference is raised by the record, it precludes summary judgment (or judgment as a matter of law). Id.

Here, the magistrate judge concluded—and the district court subsequently agreed—that Mitten could not benefit from the McDonnell Douglas presumption of discrimination because the evidence was insufficient to raise the presumption. This was because Mitten did not satisfy the fourth element of a prima facie case; he failed to show that he was disciplined less favorably under the zero tolerance policy than a similarly situated black employee, i.e., a "comparator."[17] Although

_____

[17] To be an adequate comparator, the preferentially treated individual from outside the plaintiff's protected class has to be similarly situated to the plaintiff in all relevant respects. Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (citations omitted). If this is not the case, "the different application of workplace rules does not constitute illegal discrimination."

9

Mitten pointed to certain preferentially treated black employees in non-supervisory positions, he failed to identify a more favorably treated black supervisory employee.

This was significant. "[D]ifferences in job ranks . . . are not, in and of themselves, dispositive as to whether the two individuals may be compared for the purposes of evaluating a discrimination claim," Rioux v. City of Atlanta, 520 F.3d 1269, 1281 (11th Cir. 2008) (citations omitted), but they can matter. This is because the relevant inquiry is whether the employer subjected differently ranked employees to the same or different employment policies. Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999) (citing Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1186 (11th Cir. 1984)). If the same policies were applied differently to similarly ranked employees, those employees may be compared. Here, however, Lockheed showed that the zero tolerance policy required supervisors to undertake a more proactive role than non-supervisors in trying to extinguish workplace discrimination and harassment.[18] Consequently, the

Lathem v. Dep't of Children & Youth Servs., 172 F.3d 786, 793 (11th Cir. 1999) (citing Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1186 (11th Cir. 1984)). In order to be considered "similarly situated," the compared employees must have been "involved in or accused of the same or similar conduct," yet "disciplined in different ways" for that conduct. Holifield, 115 F.3d at 1562 (citations omitted).

[18] See supra part I.A (discussing in detail the disparate expectations Lockheed places on supervisors and non-supervisors under the zero tolerance policy).

magistrate judge—and the later the district court—deemed non-supervisors inadequately similar to Mitten, a supervisor; thus a comparison could not yield a presumption of race discrimination under McDonnell Douglas.[19]

Mitten objected to the magistrate judge's recommendation.[20] He argued that, even though he failed to identify a black supervisor as a comparator, a jury nonetheless could find from circumstantial evidence in the record that Lockheed discharged him because of his race. Mitten cited, among other things, Lockheed's more severe discipline of white employees than black employees for zero tolerance policy violations. The district court considered this circumstantial evidence but found it non-probative of Lockheed's allegedly discriminatory motive for firing Mitten, and, consequently adopted the magistrate judge's recommendation and granted Lockheed summary judgment.[21]

---

[19] On the same basis, the magistrate judge recommended dismissal of Gann's and Smith's claims.

[20] Gann and Smith also objected to the magistrate judge's recommendation.

[21] The district court granted Lockheed summary judgment on Gann's and Smith's claims on the same basis. The court accepted the magistrate judge's recommendation that Lockheed's motion be denied as to Yerby's and Nichols's claims because, as non-supervisors, Yerby and Nichols had identified black comparators who had been treated more favorably than they had and thus had created a material issue of fact as to the legitimacy of Lockheed's motivation for terminating their employment.
Yerby and Nichols ultimately settled their claims against Lockheed, and, on October 19, 2009, judgment was entered against Mitten, Gann, and Smith, the remaining plaintiffs. Therefore, we have jurisdiction to entertain Mitten's appeal under 28 U.S.C. § 1291.

11

Mitten has appealed.[22] In his brief to this court, he repeats the argument he presented to the district court—that he does not need a black supervisor comparator because the record contains sufficient circumstantial evidence to create a triable issue of fact as to whether Lockheed fired him because he is white. We agree and find that the district court erred in granting Lockheed summary judgment.[23]

## III.

The district court, in dismissing Mitten's claim of race discrimination, did as federal courts routinely do in disposing of cases, like this, in which the plaintiff claims that his employer applied a workplace-conduct rule in violation of Title VII: the court used <u>McDonnell Douglas</u>'s burden-shifting framework. In so doing, the district court focused on whether Mitten's termination for his violation of the zero tolerance policy was more severe than the discipline Lockheed imposed on similarly situated black comparators. Mitten's comparators were deemed not "similarly situated," so the court found no tenable claims of race discrimination. If

---

[22] Smith and Gann also were parties to this appeal. (Smith died during the litigation, but his wife—the executor of his estate—was substituted as plaintiff.) However, after they reached settlements with Lockheed, Smith and Gann, joined by Lockheed, each submitted separate joint motions for dismissal of his appeal with prejudice. We granted those motions: Smith's on May 16, 2011, and Gann's on May 31, 2011.

[23] We review the district court's grant of summary judgment <u>de novo</u>. <u>Weeks v. Harden Mfg. Corp.</u>, 291 F.3d 1307, 1311 (11th Cir. 2002). We must view all the evidence and all factual inferences reasonably drawn from that evidence in the light most favorable to the nonmoving party—in this case, Mitten—and we must resolve all reasonable doubts about the facts in his favor. <u>Rioux v. City of Atlanta</u>, 520 F.3d 1269, 1274 (11th Cir. 2008) (citations omitted).

12

the record contained no circumstantial evidence from which a jury could otherwise infer that Mitten was fired because of his race,[24] our discussion would end here, and we would affirm the district court's judgment.

However, establishing the elements of the McDonnell Douglas framework is not, and never was intended to be, the sine qua non for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case.

Rather, the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent. See Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997) (declaring that, in cases where a plaintiff cannot establish a prima facie case, summary judgment only will be "appropriate where no other evidence of discrimination is present." (citations omitted)); Silverman v. Bd. of Educ., 637 F.3d 729, 733 (7th Cir. 2011) ("To avoid summary judgment . . . the plaintiff must produce sufficient evidence, either direct or circumstantial, to create a triable question of intentional discrimination in the employer's decision."). A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents

_____

[24] There is no direct evidence that Lockheed discharged Mitten because he is white. Mitten's case, instead, relies entirely on circumstantial evidence.

13

"a convincing mosaic of circumstantial evidence that would allow a jury to infer[25] intentional discrimination by the decisionmaker." Silverman, 637 F.3d at 734 (citations and internal quotation marks omitted); see also James v. N.Y. Racing Ass'n, 233 F.3d 149, 157 (2d Cir. 2000) ("[T]he way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove—particularly discrimination.").

A plaintiff may raise a reasonable inference of the employer's discriminatory intent through various forms of circumstantial evidence. Rioux v. City of Atlanta, 520 F.3d 1269, 1281 (11th Cir. 2008) (holding that the plaintiff established a prima facie case of racial discrimination when he did not present evidence of a comparator but presented other circumstantial evidence that was sufficient); see also Alvarez v. Royal Atl. Developers, Inc., 610 F.3d 1253, 1264 (11th Cir. 2010) (stating that the circumstantial evidence necessary to present a Title VII case of discrimination under McDonnell Douglas is "flexible and depend[s] on the particular situation" (citations omitted)); cf. Burke-Fowler v. Orange County, Fla., 447 F.3d 1319, 1325 (11th Cir. 2006) (affirming the district

---

[25] "[A]n inference, is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact . . . ." Bickerstaff v. Vassar Coll., 196 F.3d 435, 448 (2d Cir. 1999) (citations and internal quotation marks omitted).

14

court's grant of summary judgment because plaintiff "failed to establish valid comparators and presented <u>no other circumstantial evidence suggesting racial discrimination</u>" (emphasis added)). Yet, no matter its form, so long as the circumstantial evidence raises a reasonable inference that the employer discriminated against the plaintiff, summary judgment is improper.

Here, Mitten did not need to rely on the <u>McDonnell Douglas</u> presumption to establish a case for the jury. As the following discussion explains, the record contained sufficient evidence to allow a jury to infer that Lockheed fired Mitten because he is white. We begin by presenting the facts shown by the evidence. We then explain why those facts could yield the reasonable inference that Lockheed fired Mitten because of his race.

A.

The record evidence, construed in a light most favorable to Mitten, establishes the following facts:

1.

In 2001, Tom Heiserman became Lockheed's Vice President of HR, the highest-ranking HR position at Lockheed. One function of this role is to enforce Lockheed's workplace-conduct rules, including the zero tolerance policy. Thus, Heiserman and his HR staff are charged with disciplining employees who have

15

violated the policy.

2.

Less than two years after taking over Lockheed's HR operations, Heiserman and his staff began to face public criticism over their enforcement of the zero tolerance policy in the wake of a July 2003 mass-shooting spree at the company's plant in Meridian, Mississippi. The shooter, a Lockheed employee named Doug Williams, killed five Lockheed employees and himself and wounded eight others.[26] In the shooting spree's wake, it became public that Williams had been a white supremacist—a fact he had made clear to his black coworkers—and some groups, including in the news media, began to label the shootings as a "hate crime" targeting black Lockheed employees. Of more concern to Lockheed, however, was that some groups also began to blame the shootings on company HR officials, claiming that those officials knew of Williams's racist propensities long before the shootings transpired, but did little to curb his harassing ways.

a.

---

[26] The morning of July 8, 2003, Williams arrived at the Meridian plant with an assortment of firearms in his truck. Shortly after the start of a mandatory training course he was attending in a building separate from the main plant, Williams exited the building, retrieved a shotgun and a semiautomatic rifle from his truck, and reentered the building where the training course was ongoing. Williams opened fire, shooting at least five persons attending the training course. Williams then exited that building and went into the main plant where he shot more victims before killing himself. Bailey v. Lockheed Martin Corp., 432 F. Supp. 2d 665, 666–67 (S.D. Miss. 2005).

16

These allegations initially arose in various civil suits brought by victims and deceased victims' families against Lockheed—the first was filed soon after the shootings in 2003, but some proceeded well beyond.  E.g., Bailey v. Lockheed Martin Corp., 432 F. Supp. 2d 665, 669–71 (S.D. Miss. 2005); Tanks ex rel. Estate of Willis v. Lockheed-Martin Corp., 332 F. Supp. 2d 953 (S.D. Miss. 2004), rev'd in part by, 417 F.3d 456 (5th Cir. 2005).

According to the plaintiffs in these cases—which asserted race discrimination claims under Title VII and § 1981 and sought millions of dollars in compensatory damages for injuries arising from the shootings[27]—Lockheed HR officials knew that Williams was a racist who harassed his black coworkers.  The plaintiffs in Tanks and Bailey, for example, alleged, among other things, that Lockheed officials knew that: (1) in 2001, Williams had made threatening remarks to black coworkers; and (2) on June 12, 2003, Williams removed his white boot covering, placed it on his head and mimicked a Ku Klux Klan member to intimidate his black coworkers."  E.g., Compl. at 4, Tanks, No. 4:03-cv-408LN (S.D. Miss. Dec. 16, 2003).  In light of this knowledge, the plaintiffs claimed, HR officials tortiously did too little to curb Williams's harassing conduct.  See, e.g.,

---

[27]  The plaintiffs in these cases sought to recover tort damages from Lockheed for such injuries as lost income, pain and suffering, emotional distress, loss of companionship, and loss of value of life.

17

Bailey, 432 F. Supp. 2d at 669–71 n.1 ("'Due [to] their knowledge . . . of the nature and depth of Williams' racial hatred and threats toward African-American and other employees, the supervisory personnel knew or were charged with knowledge, or both, that it was only a matter of time before Williams resorted to the type [of] harmful . . . action that occurred.'"); Tanks, 332 F. Supp. 2d at 955 (explaining the plaintiffs' claims of "'intentional and negligent acts of Lockheed' based on . . . allegation[s] that Lockheed[] had actual and constructive notice and knowledge of Williams' violent nature and his hatred of blacks [and] 'intentionally failed to provide a reasonably safe work environment' for its employees by protecting them").[28]

b.

On the heels of several of the initial civil lawsuits, the EEOC, in July 2004, made similar allegations against Lockheed HR officials. Following an investigation into the Meridian shootings, the EEOC prepared a report that expressly faulted Lockheed's HR for having fostered a workplace environment in Meridian that was hostile to black employees. While the EEOC acknowledged that Williams, alone, had created a racially hostile work environment through his threatening comments

---

[28] The plaintiffs in Tanks ex rel. Estate of Willis v. Lockheed-Martin Corp., 332 F. Supp. 2d 953 (S.D. Miss. 2004), rev'd in part by, 417 F.3d 456 (5th Cir. 2005), and Bailey, 432 F. Supp. 2d at 669–71, raised these claims to argue that they fell within the intentional tort exception to Mississippi's Workers' Compensation Act, Miss. Code Ann. § 71-3-1 et seq.

18

to black coworkers, its investigation concluded that Lockheed had allowed this hostility to intensify by not adequately responding to these known race-based threats. Moreover, the EEOC suggested, such hostility toward black employees still festered over a year after the shootings, as HR had yet to remedy it.

c.

Then, in the spring of 2005, less than a year after the EEOC issued its report and while many of the civil cases remained ongoing, Lockheed learned that ABC News planned to produce a report commemorating the second anniversary of the Meridian shootings. The special report was to be aired on the network's investigatory-newsmagazine show, "Primetime Live."

Lockheed first became aware of ABC News's intentions on March 15, 2005, when ABC filed a Motion to Intervene in the Tanks litigation. ABC, in its memorandum in support of its motion, requested to intervene in the case to oppose any court order that would restrict public access to or seal documents or proceedings in the case. Mem. of ABC in Supp. of Mot. to Intervene 1, Tanks, No. 4:03-cv-408LN (S.D. Miss. Mar. 15, 2005). ABC argued that "[t]he causes of the shooting and precautions that were taken or could have been taken are of significant public interest and, therefore, of great importance to [ABC] in its newsgathering function on behalf of the public." Id. ABC claimed further that it should be

19

permitted to intervene to "protect its interest and that of the public to access the file and proceedings in th[e] case," which it argued could have "obvious implications for the safety of workers not only at [the Meridian] facility but at other plants across the United States." Id. Lockheed responded in opposition to ABC's motion on March 29. See generally Resp. of Lockheed-Martin Corp. to Mot. of ABC, Inc., to Intervene, Tanks, No. 4:03-cv-408LN (S.D. Miss. Mar. 29, 2005).

Around this time,[29] ABC News also began making "repeated requests" to interview Lockheed management officials for the purposes of its upcoming "Primetime Live" report.[30] ABC News wanted to provide Lockheed officials an opportunity to respond to the charges against them. Lockheed, however, denied all of these interview requests.

Lockheed management became concerned about what ABC News had planned for its upcoming report. This worry is best evidenced in the record by testimony that, some time during the spring of 2005, Lockheed management made the HR staff at Lockheed's Marietta, Georgia plant—and presumably at other facilities—explicitly "aware that [the ABC News report] was coming" and even required the Marietta HR employees to attend meetings with in-house counsel to

---

[29] The record does not state whether ABC news began making its interview requests before or after its March 15, 2005 motion to intervene in Tanks.

[30] The record is unclear as to which specific Lockheed officials ABC News requested to interview.

20

discuss the significance of the upcoming news piece.

3.

It was in April 2005, as Lockheed was growing concerned about ABC's intentions, that HR officials at the Marietta plant learned of the NASCAR email and Mitten's involvement.

a.

On April 5, Nelson Phillips, a black hourly employee at the Marietta plant, was shown a copy of the NASCAR email by another black hourly employee, Marvin Armstead.[31] The email's racial content upset Phillips—who, for some time, had made it known vociferously that he felt victimized by intolerance of black employees at Lockheed—and he immediately retained counsel.

The next day, April 6, Phillips emailed Dorie Tuggle, who held the HR position of Senior Manager of Diversity and Equal Opportunity Programs,[32] to report the NASCAR email and to notify her that he had hired an attorney.[33] Tuggle

---

[31] Lockheed investigators determined that Armstead showed the email to both Phillips and Anthony Young, who was Armstead's Shop Steward and union representative, because, after Armstead had read the email, he had decided that "it didn't seem right."

[32] Notably, in this role, Tuggle was part of the on-site response team that assisted in the wake of the Meridian shootings.

[33] Specifically, Phillips's email to Tuggle said: "I need your business mailing address please, to send you a letter from my attorney's office regarding an e-mailed letter entitled **'Top 10 reasons why there are no black NASCAR drivers......'** found in my break area." (Emphasis and omissions in original).

21

quickly asked that Phillips call her office, and Phillips called as requested. During their conversation, however, Phillips displayed an air of combativeness and litigiousness by insisting that, in lieu of resorting to Lockheed's internal complaint procedures, he would handle the entire matter through his attorney and stressing that he would not meet with Tuggle in any manner until she heard from his lawyer.

Phillips's assertiveness persisted when, the next day, Treena Hancock, another member of Lockheed's HR department, contacted Phillips. Hancock requested that Phillips meet with her in her office to discuss the incident. Phillips responded "No!" He then exclaimed that he was sick of all the "racially motivated things that go on around here" and that he would only discuss the NASCAR-email matter with Tuggle, and then only after she heard from his attorney.

On April 14, Tuggle finally received communication from Phillips's attorney. The attorney sent Tuggle a letter of protest that demanded that Lockheed investigate the sources of the NASCAR email in order to "assist[] in obtaining the cessation of racially motivated discrimination" within Lockheed's Marietta facility.[34] The letter mentioned that Phillips was "very concerned regarding [the email's] discovery, as this [was] not his first encounter with racial discrimination at his place of employment."

---

[34] The letter was signed by Bridget N. Summerour, for the law firm of Deming, Parker, Hoffman, Green & Campbell, LLC.

b.

Phillips's complaint was the first HR had received about distribution of racially insensitive emails. Tuggle, consequently, took it—and Phillips's attorney's demands—seriously. She quickly referred the matter to Lockheed's Security and Emergency Services ("SES") department for a formal investigation.[35]

Sandra Bohner, who was employed as an HR Business Partner[36] at the Marietta location,[37] oversaw the SES investigation, which began on April 18. The investigation was conducted by J.R. Reynolds, SES's Marietta "Site Lead."[38] SES, in performing the investigation, conducted forensic examinations of employees' computers to trace the NASCAR email chain. Although these forensic exams never identified the NASCAR email's original source—i.e., whether it originated within or without Lockheed—twenty-one employees were identified as "subjects," since they either had sent or received the email through their Lockheed email accounts.

---

[35] Tuggle notified SES on April 7, 2005; however, the investigation was stalled until she heard from Phillips's attorney.

[36] At Lockheed, an HR Business Partner—also known in the company as a member of the multifunction HR representative staff—simply refers to an employee who is a human resources generalist. Thus, Bohner had various HR responsibilities, and did not specialize in any one area. She had been employed in this role since 1998. Bohner reported directly to Calvin Coolidge Bryant, the Senior Manager for HR at the Marietta plant.

[37] Bohner, like Tuggle, was part of the on-site response team that assisted after the Meridian shootings in 2003.

[38] Reynolds was the head of SES operations within the Marietta plant.

23

Upon completion of SES's forensic tests, Bohner, during a period from April 25–28, interviewed all twenty-one "subjects." Of the twenty-one employees interviewed, only eight—including Mitten—were found to have violated the zero tolerance policy's prohibition against distribution of racially insensitive material. Seven of the eight were white employees, none of whom had informed HR of their conduct. (The only black employee found to have distributed the email was Marvin Armstead, who had shown it to Phillips as well as his union representative.)

Along with Mitten, the six other white employees who distributed the NASCAR email were Michael Porterfield, Herbert Gann, William Smith, Scott Vinson, James Nichols, and Martin Yerby. Like Mitten, Gann, Smith, and Vinson held salaried, supervisory positions.[39] Yerby, Nichols, and Porterfield, however, were employed as non-supervisors—Yerby and Nichols held salaried positions; Porterfield held an hourly position.[40]

---

[39] When terminated, Gann held the position of Flight Line Supervisor and had worked for Lockheed for 25 years; Smith held the position of Production Flight Supervisor and had been with Lockheed for over 30 years.

[40] Porterfield was as the only hourly employee discharged and, thus, was the only fired employee in the union, which intervened on Porterfield's behalf. The union challenged Porterfield's termination as violative of his collective bargaining rights and as too severe a punishment based on his actions. The case went to arbitration, and, in May 2006, the arbitrator ruled in Porterfield's favor. The arbitrator concluded that Porterfield had, indeed, violated Lockheed's zero tolerance policy, but that termination was too severe in light of (1) his non-management role, (2) his previously clean discipline record, and (3) the fact that Lockheed had never before fired anyone for sending racially offensive emails. As a result, Porterfield's termination was rescinded and he was reinstated with full seniority and pay.

Each of the seven white employees fully cooperated during Bohner's interviews. That cooperation enabled Bohner and SES to unravel how each employee received the NASCAR email and the manner in which he subsequently distributed it.

For instance, the investigation revealed that Mitten, on March 29, received the NASCAR email from Porterfield, who had received it from Yerby that same day. Mitten then forwarded the email to his own supervisor, Vinson. He did so, however, not to raise a complaint about the email, but merely to share it with Vinson, who Mitten believed would find it humorous.[41] Mitten and Vinson both "chuckled [about the email] but [also] discussed the dangers of such items in the workplace and that this was not good," which led Mitten to email Porterfield to say he "should not be sending this [type of email] and he needed to be careful about sending such emails."

Gann, another supervisor, also received the NASCAR email from Porterfield. Afterward, he both forwarded the email to his home email account and printed it to share with his friend and coworker, Gerald Waites—a black hourly employee—who found the email funny and inoffensive.

Smith, the third supervisor implicated, also received the email from

---

[41] Vinson told SES and Bohner that Mitten was not trying to report the email.

25

Porterfield; however, unlike Gann and Mitten, he did not send the email to anyone within Lockheed. Porterfield worked under Smith's supervision and had forwarded the email to Smith while Smith was on vacation—Smith had given his computer password to Porterfield so that Porterfield could forward some information about the progress of a work project.[42] Smith saw the NASCAR email from Porterfield upon his return to work. Since he had been out of the office for a prolonged period, Smith had an "ungodly amount of email backed up in his inbox." To save time, he read only a few lines of the NASCAR email and then forwarded it—along with several other emails he planned to read later—to his daughter's home email address, which was his personal account as well.

As for Yerby and Nichols, the salaried, non-supervisors implicated, Yerby received the NASCAR email from Hal Bauguss,[43] a Lockheed employee in a salaried, non-supervisory position. Yerby then forwarded the email from his Lockheed email account to eighteen people—six Lockheed employees at their Lockheed email addresses, including Porterfield, and another twelve individuals at external email addresses. Nichols received the email from Yerby and then, like

___

[42] Porterfield sent the NASCAR email to Mitten and Gann, amongst others, using Smith's account.

[43] That Yerby received the email from Bauguss, a salaried employee of Lockheed, was not discovered during Lockheed's investigation; rather, the information came out at Yerby's deposition during discovery in this case.

Smith, forwarded the email to his personal email address. He also attempted to forward the email to an outside email account, which turned out to be inoperable and the delivery failed.[44]

Additionally, the investigation and interviews disclosed that Phillips, as he had with Tuggle, often displayed a combative, litigious nature in his interactions with his white supervisors. It was learned that, for about ten years, Phillips had made a multitude of combative threats to file reports with the EEOC's Atlanta District Office to report his white supervisors as discriminatory because they had given him job assignments he did not want.[45]

The investigation and interviews concluded on April 28. Bohner then began

---

[44] The record reveals that the disciplinary review committee, in fashioning a recommended discipline for Nichols, initially took into account that he had forwarded the email only to one functional email address—his personal account. The committee noted that one of the accounts to which Nichols had sent the email was a "bum" email address and, based on this, initially suggested that a discipline less harsh than termination was appropriate. The record suggests, however, that Heiserman, the HR director, persuaded the committee that termination nevertheless was preferable.

[45] For example, Vinson disclosed to Bohner that, on April 27, 2005, Phillips, in an effort to have Vinson improve Phillips's job assignment, threatened EEOC action based on a theory of retaliation for his NASCAR-email complaints. Phillips allegedly asked Vinson, "Do you understand the Company and Federal policies about retaliation against an individual that has filed a complaint such as I have?" He then exclaimed, "[Y]ou know I will push it to the full extent." Similarly, another "subject" of the investigation interviewed told Bohner that he assumed Phillips was the one who reported the NASCAR email because "he knew [Phillips] and [that] he would make a big deal about it," since "he had never met a more prejudiced person than Phillips."

27

preparing for HR a summary report of the inquiry's findings, including the foregoing information.

c.

Meanwhile, also on April 28, Lockheed officials' learned, for certain, that ABC News's upcoming special on the Meridian shootings would raise the same accusations raised in federal court and by the EEOC: that Lockheed HR tolerates white-on-black discriminatory harassment. This time, however, the allegations would be presented to a far more public audience—national primetime television viewers.

On that date, Brian Ross, ABC News's Chief Investigative Correspondent and a featured reporter on "Primetime Live," confronted the Chief Executive Officer of Lockheed-Martin Corporation ( Lockheed's parent corporation), Robert Stevens, at the corporation's annual shareholders meeting in Albuquerque, New Mexico. The exchange between Ross and Stevens proceeded as follows:[46]

> [Brian Ross:] This is Brian Ross with ABC News, "Primetime Live." How are you? Nice to see you. We're doing a story about what happened at your Meridian plant, and I want to ask you, <u>do you find the word nigger offensive</u>?
>
> [Robert Stevens:] Brian, I am surprised that you would even ask me a question such as that.

---

[46] This is how the interview was presented on "Primetime Live."

[Ross:] <u>Why was it tolerated so long at your plant if you find it offensive?</u>

. . . . [47]

[Stevens:] The shooting in Meridian, Mississippi was the act of a single person.  And relative to . . .

[Ross:] Who had threatened to kill Blacks for more than a year and a half.  He used the term nigger on a regular basis on the floor plant.  <u>Your people were aware of it at the plant management level.  We've seen the notes from your own people</u>.  He even had this hat.  He had it like this as a Ku Klux Klan cap he wore.  <u>What about your zero tolerance policy?</u>  Why was that permitted?

[Stevens:] Lockheed Martin has a zero tolerance policy . . .

[Ross:] So, why was that permitted?

[Stevens:] Actions like that are not permitted in Lockheed Martin.

[Ross:] <u>Yet Lockheed's own documents from December 2001 show Williams was permitted to stay on the job long after the company became aware of death threats against Black co-workers.</u>

[Stevens:] There is zero tolerance in Lockheed Martin.

[Ross:] <u>So why was Doug Williams still employed there after he threatened Blacks, he called them niggers all the time?</u>

[Stevens:] I'm not going to elaborate any further discussion with you today on the situation at Meridian.

(Emphasis added).

---

[47]  At this point in the dialogue, Ross narrated to the television audience that Stevens, during the interview, had called the shootings an unspeakable tragedy but one unconnected to racial discrimination at the plant.

d.

The day after this encounter, April 29, Bohner finalized her investigation report and delivered it to the Marietta facility's disciplinary review committee for their use. The empaneled disciplinary review committee consisted of four senior managers from the Marietta plant:[48] Dorie Tuggle; Jack Lambert, the Marietta Site Director of HR and the head of the committee;[49] Calvin Coolidge Bryant, the Senior Manager for HR;[50] and J.R. Reynolds,[51] the SES head.[52]

The committee's final decision would serve merely as a recommendation; ultimate disciplinary decision-making authority rested with Heiserman. Although he was in Texas, Heiserman desired to stay fully abreast of the investigation, so he remained in almost daily contact with members of the disciplinary review

---

[48] The composition of the disciplinary review committee was based on certain company practices in place at the Marietta plant that established who was to serve on the committee.

[49] As Marietta's HR "Site Director," Lambert, the chief HR official in the plant, was in charge of HR generalists, like Bohner, as well as HR members in Lockheed's Equal Employment Opportunity office, like Tuggle. Lambert only reported to Heiserman at company headquarters in Fort Worth. Lambert originally took this position in September 2000.

[50] Bryant, in this role, directly oversaw the HR generalists, or HR Business Partners, like Sandra Bohner. Bryant was Lambert's subordinate and Tuggle's peer.

[51] Reynolds was Lambert's equivalent within SES. Security is considered a separate capacity within the HR department at Lockheed and, thus, has a distinct organizational structure from those in charge of general HR duties like Lambert, Bryant, and Bohner.

[52] Lambert and Reynolds are white. Tuggle and Bryant are black.

committee.[53]  He also continually briefed Lockheed's President, Ralph Heath, on the ongoing investigation.[54]

e.

Once the disciplinary review committee was convened, Lambert, to aid the committee's—and Heiserman's—decision making, had Bryant prepare a spreadsheet, which committee members called a "matrix," summarizing the pertinent information contained in Bohner's investigation report.  The "matrix," listed criteria deemed significant to the committee and Heiserman's discipline decisions: (1) the name of each employee known to have been involved with the NASCAR email's distribution; (2) the employee's role with Lockheed, i.e., whether he held a supervisory, non-supervisory, or hourly position; (3) the actions taken by that employee after his receipt of the email; (4) the specific Lockheed policy or policies the employee violated; and (5) the committee's recommended discipline for that employee.

---

[53]  For example, as discussed in note 44, <u>supra</u>, the disciplinary review committee originally only wanted to suspend Nichols.  They made this clear to Heiserman through email.  Heiserman replied, "We can talk next week.  Need to hold line."  Eventually, the committee held the line that Heiserman preferred and recommended Nichols's termination.

[54]  During this time, Meridian, most likely due to knowledge of the upcoming ABC News report, weighed heavily on Heiserman's mind.  Indeed, at one point, in an email exchange with the disciplinary review committee, Heiserman mistakenly referred to the NASCAR email investigation as the "Meridian investigation."

31

The "matrix" also included a column reflecting each employee's race.[55]  The

employees, including Mitten, were recorded as either a "W," for white, or a "B," for

black.  Lockheed has represented that it had no policy in place calling for HR to

account for an employee's race in this fashion; instead, Bryant has supported his

tracking of race as merely a decision of personal convenience, intended to aid his

putative future reporting of that information to external authorities.  Evidence in the

record contradicts Bryant's stated reason, however.  Indeed, according to other HR

officials—including Heiserman—there simply was no "possible [HR] reason" or

"legitimate . . . business purpose for Lockheed to be" monitoring the race of

employees in the course of a discipline investigation.

Moreover, Bryant has claimed that employee race did not play any role in the

ultimate discipline decisions made, despite appearing on the "matrix" as a key

consideration in those discipline determinations.  That is, Bryant has stated, it was

understood that Lockheed's principal decisionmakers would "close one eye [to the

race entry]" when looking at the "matrix."

f.

Utilizing the "matrix," the disciplinary review committee, on May 3,

recommended that Mitten (and the other six white employees who distributed the

---

[55]  The employee's sex also was recorded.

NASCAR email) be discharged.[56]  As for Marvin Armstead, however, the committee recommended only delivery of "a letter to report such materials in the future" because he was found to have attempted to report the email.

Later that same day, Bryant emailed Heiserman a final "matrix," upon which Bryant noted the committee's recommendations.  Heiserman reviewed the matrix and made no changes to the punishments.  As a result, on May 5, Lockheed informed Mitten and the other six white employees that they would be fired for distributing the racist email.[57]

g.

Soon after Mitten and the other white employees were fired for distributing the NASCAR email, Heiserman reviewed and approved a letter, written under the signature of Lockheed's President, Ralph Heath, to be emailed to all Lockheed employees on May 9.  The letter notified Lockheed staff that "an offensive message with racial overtones was sent to a small number of employees through company e-mail," and that seven employees had lost their jobs as a result because such conduct violated the zero tolerance policy.  Beyond that, however, the letter disclosed little

---

[56] As discussed in notes 44 and 53, supra, during the course of the investigation, the disciplinary review committee had recommended that Nichols receive a suspension, since he only had sent the email to one operable email address—his home account.  Nonetheless, Nichols ultimately was terminated, as preferred by Heiserman.

[57] Lockheed gave the employees the option to resign in lieu of termination.  Mitten refused to resign, so he formally was fired.

specifics of the violations or the resulting investigation; it simply warned that distributing racist emails would not be tolerated by Lockheed management. Future similar conduct, the letter declared, must be reported to management, after which the incident would be "investigated, and the appropriate action, up to and including termination, [would] be taken." The letter also offered employees an opportunity to enroll in voluntary additional training on Lockheed's anti-harassment policies.

4.

On May 12, 2005, one week after the NASCAR email firings, ABC News aired its "Primetime Live" report on the Meridian shootings. ABC News's report, as anticipated, was highly critical of Lockheed's HR department. Calling the Meridian shootings "the worst hate crime against African-Americans since the civil rights movement," the report focused on the lingering questions about HR's meager enforcement of the zero tolerance policy against Doug Williams, who HR knew was a white supremacist and a threat.[58] Like the civil litigants and the EEOC before it, ABC News told its audience that HR officials' tolerance for harassment of black Lockheed employees created an environment that ultimately permitted Williams's shootings to occur.

---

[58] For example, the ABC News report stated that HR officials knew that "Williams fumed when blacks at the plant complained about his racial slurs or received better-paying jobs," and that he "once wore the bootie of a white protective suit on his head in the shape of what black workers said looked like a Ku Klux Klan hood."

For example, the report included an interview with Aaron Hopson, a black employee who claimed that Williams threatened to kill him in 2001—an allegation alluded to in the Tanks complaint. According to Hopson, "[Williams] said, "You know, one of these days, I'm goin' to come in here and kill me a bunch of niggers and then I'm goin' to kill myself." This threat, ABC News claimed, "was reported to the plant managers and a company equal employment officer was sent to Meridian to investigate the matter in December 2001";[59] yet, despite the company's zero tolerance policy, Williams kept his job and merely had to undergo anger management counseling.[60]

Based on this, ABC News emphasized that Lockheed failed in its responsibility to avoid a hostile work environment for black employees, "a workplace where people aren't threatened with death and called 'nigger,'" and that "[i]t's beyond any kind of description why they allowed this to take place. They could have stopped it." (Internal quotation marks omitted).

---

[59] The report stated that "Lockheed company documents obtained by ABC News show[ed] that [, company equal employment officer,] Darold Sawyer, based at Lockheed's offices in Marietta, Ga., interviewed several workers in Meridian and took extensive notes detailing Williams' threats to kill black workers."

[60] Darold Sawyer's investigation notes, according to the ABC News report, also showed that one of Williams's victims, Lynette McCall, had reported to management that Williams told her he saw "'a race war coming,' and that she 'was on his list too.'" The news report would go on to say that "[o]n the day of the killings, Williams stalked his way to McCall's work station where witnesses say he taunted her before shooting her at point-blank range."

From there, the report exhorted that, if proven, such tolerance for race discrimination against blacks placed Lockheed in a precarious financial and public relations position. To make this point, ABC News interviewed the lead lawyer in the ongoing Tanks litigation, who noted that if race discrimination did not motivate the shootings, "'then all you have is a workmen's compensation claim. Maybe an insurance claim here or there. . . . So both for economic reasons, for public relations reasons, the company would be unwilling to have someone say [the shootings were] racial if they could avoid doing so.'" (Omissions in original). Moreover, the report ominously warned that Lockheed's "$25 billion in [federal] government contracts" were in peril for the "largest defense contractor in the country." This is because, ABC News explained, "'[i]f the federal government wanted to, the federal government could review their contracts, . . . [a]nd there is a provision under which contracts could be debarred'" based on findings that the company tolerates discrimination against black employees.

5.

In June 2005, a month after the NASCAR email firings and the ABC News story's airing, Lockheed officials addressed new violations of the company's zero tolerance policy. In this case, employees at both the Marietta and Fort Worth, Texas facilities were found to have distributed a different racially insensitive email.

36

The content of this new email targeted the white race, however.

a.

On June 20, 2005, Sharron Jones, a black salaried, non-supervisor at the Marietta plant,[61] used her Lockheed email account to forward to eight other Lockheed employees an email containing a video clip entitled "How to Dance Like a White Guy" (the "White Guy Video").[62] The video made various derogatory references about whites, referring to them as "cracker[s]," "whit[ies]," "honk[ies]," and "homo[s]."[63]

Jones forwarded the White Guy Video email, which she had been sent by a "very good" friend from outside of Lockheed, after returning to work from a prolonged vacation. Her email box was very full and she forwarded the email to the eight employees without much thought. Seven of the eight recipients were black and one was white.[62] One of the black recipients was Eric Saxon, a salaried, non-supervisory employee at the Marietta facility.

Another of the black recipients of Jones's forwarded email sent an email

---

[61] In June 2005, Jones was employed as a Senior Logistics Management Analyst.

[62] Lockheed does not argue that there is any material difference in the level of racial offensiveness between the White Guy Video and the NASCAR email.

[63] The video also contained sexually explicit references to masturbation and female genitalia and portrayed Adolf Hitler.

[62] The white recipient found the email funny and was not offended.

reply to Jones to warn her that the White Guy Video might be considered offensive to some people. This warning made Jones—who had received Ralph Heath's May 9 letter and even attended some of the additional zero tolerance policy training courses offered in the wake of those firings—highly worried that she may have jeopardized her employment. To protect herself, Jones sent a follow-up email to all eight of her original recipients. In that follow-up, Jones expressed some regret for forwarding the video only because it "MAY be considered offensive . . . not to me of course." She asked that each recipient delete the email without any further forwarding.[63] Jones then visited her recipients personally to ensure that the email, indeed, was deleted and to advise them to notify their respective supervisors in order to avoid discipline.

On June 21, Jones, hoping to save her own job, informed her manager about her email message and apologized for sending it.

After Jones self-reported, her manager relayed her disclosure to HR. And,

_____

[63] Jones's email read:

I wasn't thinking when I may have sent an e-mail entitled "how to dance" . . . someone advised me that it MAY be considered offensive . . . not to me of course

However, please don't forward it . . . please delete

tanx [sic]

(Omissions in original).

38

starting on June 22, Sandra Bohner oversaw yet another SES investigation.  The investigation revealed the preceding information about Jones's conduct and that the only employees implicated, other than Jones, were her recipients.  Saxon was the only other employee who, aside from Jones, had distributed the email; he, like Smith and Nichols earlier, had merely forwarded the email to his personal account.  Saxon never reported his conduct to HR or his supervisor.

A disciplinary review committee met in the latter part of July 2005 to consider discipline for the employees implicated.  As with the NASCAR email incident, the new disciplinary review committee for the White Guy Video email included Lambert, Bryant, Reynolds, and Tuggle; Heiserman, however, again had final say on the ultimate disciplinary action taken and thus was kept informed of the investigation's progress.  The disciplinary review committee once again created a "matrix" to summarize pertinent information.  The newest matrix, as before, recorded the investigated employee's name, the employee's position within Lockheed, a summary of the employee's conduct and whether it violated Lockheed conduct policies, and, finally, a recommendation for disciplinary action.  This time, however, the "matrix" for the eight employees implicated—seven of whom were black—did not include a notation for employee race.

The disciplinary review committee, utilizing the "matrix," recommended that

Jones and Saxon each only receive a temporary suspension. With respect to Jones, the committee felt that a letter of reprimand and a thirty-day, unpaid suspension would suffice in light of the evidence that she: (1) was cleaning out her email in-box after her vacation and sent the White Guy Video without malice; (2) took swift action in reaching out to the recipients of her email upon being notified that the email might be considered offensive; and (3) apologized to her superiors after being so notified. For Saxon, the committee recommended only a two-week, unpaid suspension because he had merely sent the email home.

On or around August 4, 2005, Bryant emailed the disciplinary review committee's recommendations and the new "matrix" to Heiserman. Once again, Heiserman approved the committee's recommendations without change; Jones and Saxon were thus suspended as the committee had recommended.[64]

b.

In addition to the events at the Marietta facility, in June 2005, around the time that Jones forwarded her racist email, two non-black Lockheed employees

---

[64] Prior to granting his approval to the recommendations, Heiserman displayed some worry about the committee's recommendation not to discharge Jones because her conduct so closely resembled that of the men fired for distributing the NASCAR email. Indeed, Heiserman's reluctance is shown in an August 4, 2005 email reply to Bryant, in which Heiserman wrote: "Has legal reviewed/agreed [to the Jones-discipline recommendation]? I am uneasy, but will support [the recommended discipline] if legal feels that it doesn't hurt the outstanding cases." It reasonably can be inferred that the "outstanding cases" referred in part to the firings of the white employees who had forwarded the NASCAR email, in addition to the ongoing litigation related to the Meridian shootings.

40

were discovered to have violated the zero tolerance policy by also forwarding the White Guy Video to several other employees.[65] The violators were Joe DeLeon and Clifford Wood, both non-supervisors employed at the Forth Worth plant.[66]

There were many similarities between DeLeon's and Wood's cases and Jones's. For instance, after forwarding the video, DeLeon and Wood, like Jones, received warning from one of their emails' recipients that the attached video might be considered offensive. And, as a result, like Jones, each subsequently contacted the recipients of his email—DeLeon apologized to his recipients; Wood asked his not to open the video attachment and, instead, to delete the email altogether. Notwithstanding these similarities to Jones's case, DeLeon and Wood were both terminated for breaching the zero tolerance policy.

Michael Hester, the Senior Manager of HR at Lockheed's Fort Worth

---

[65] Additionally, although scarce, the record contains some evidence that, in mid-May 2005—prior to the Jones and Saxon investigation—Lockheed had discovered that Denny Tucker, a white salaried, non-supervisor at the Marietta facility, had received and distributed to an individual outside of Lockheed an email containing the "White Guy Video." Tucker, like Jones, self-reported his conduct to two supervisors. Although there is some evidence to suggest that Tucker's self-reporting occurred before anyone from Lockheed had confronted him, we give it little weight because, unlike Jones, Tucker self-reported after Lockheed's investigation into his conduct had started, and there is nothing in the record to rebut the inference that he only self-reported because he knew he was under investigation. Ultimately, although Jack Lambert recommended that Tucker receive only a one-week, unpaid suspension, Tucker was fired for his conduct.

[66] DeLeon and Wood each received the email from a source outside of Lockheed.

facility,[67] coordinated the DeLeon and Wood investigation and served as the head of their disciplinary review committee. Oddly, from the outset, Hester characterized their offenses as racist against blacks. Specifically, notwithstanding that all involved, including Sharron Jones, viewed the White Guy video as, possibly, offensive toward whites, Hester characterized oppositely, as "mocking the Black race."[68] Moreover, in reviewing their cases, Hester did not consider DeLeon's and Wood's actions in notifying and apologizing to their emails' recipients as mitigating factors in fashioning discipline—this despite the fact that he admits he was in constant correspondence with officials in Marietta in an attempt to ensure consistent outcomes in the dual White Guy Video investigations.

Although Hester led the disciplinary review committee, Heiserman, yet again, had ultimate authority on discipline. Consequently, like his peers in the previous investigations, Hester remained in constant communication with Heiserman throughout the inquiry into DeLeon's and Wood's conduct. In the course of their communications, Heiserman made it abundantly clear to Hester that he preferred that DeLeon and Wood be fired for their actions.[69]

---

[67] Hester was Calvin Bryant's counterpart at the Fort Worth location.

[68] Hester made this characterization in an email sent to other HR officials in Fort Worth.

[69] For example, in an email he sent to a subordinate, Hester stated that, no matter what support DeLeon and Wood received from other employees—including their own supervisor—Heiserman's mind was set on termination: "I [Hester] just came from Heiserman's

B.

The foregoing circumstantial facts preclude summary judgment in this case as a jury reasonably could infer that Lockheed only fired Mitten because he is white. The evidence yields this inference because it: (1) suggests that Lockheed's justification for firing Mitten is a pretext for racial animus; (2) shows that Lockheed had a substantial incentive to discipline white employees more harshly than black employees in the summer of 2005; and (3) indicates clearly that Lockheed consciously injected race considerations into its discipline decision making without an adequate explanation for doing so.

1.

Lockheed asserts that Mitten was fired because he was employed as a supervisor, not because he is white; however, record evidence permits a jury to infer reasonably that this justification merely is a pretext for a discriminatory motive. See, e.g., Silverman, 637 F.3d at 734 (stating that circumstantial evidence that the employer's offered justification for an adverse employment action is pretextual could permit a reasonable jury to infer the employer's discriminatory intent). The evidence shows that Tom Heiserman, in the summer of 2005, discriminatorily fired

_____

office and he still feels that this is grounds to proceed with Termination. Please work up two Termination Summary Documents ASAP." DeLeon and Wood were fired soon thereafter, in August 2005.

white employees employed in non-supervisory positions who, like Mitten, distributed racially insensitive emails.  Although these other fired white employees were not supervisors, a jury reasonably could conclude that Heiserman, having discriminatorily fired white employees for similar conduct around the time of Mitten's discharge, also discriminated against Mitten.  See Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1286 (11th Cir. 2008) (finding evidence of other acts of discrimination by the same decisionmaker against other employees in the plaintiff's protected group to be admissible under Fed. R. Evid. 404(b) because that evidence is probative of the decisionmaker's discriminatory intent).[70]

a.

In the summer of 2005, Heiserman fired four white salaried, non-supervisors who violated the zero tolerance policy by sending racist emails: James Nichols, Martin Yerby, Joe DeLeon, and Clifford Wood.  During that time, Heiserman more leniently disciplined similarly situated black employees who engaged in virtually identical conduct: Eric Saxon and Sharron Jones.[71]

---

[70] The district court improperly dismissed this Fed. R. Evid. 404(b) basis for considering such evidence.  The court, displaying just how beholden it was to McDonnell Douglas analysis, claimed that Heiserman's other acts of discrimination were irrelevant to Mitten's case because, "[u]ltimately, [Mitten is] charged with locating comparators outside of [his] protected class, who received different treatment [and] [l]ocating comparators in the same protected class who received the same treatment cannot be a substitute."  (Emphasis in original).

[71] Heiserman, himself, recognized that the actions of the employees who distributed the NASCAR email and those of Jones and Saxon were nearly identical.  As described in note 64,

44

For example, Nichols's case closely mirrors Saxon's in all ways except the respective punishment each garnered. As discussed in part III.A.3.b, supra, Nichols, after receiving the NASCAR email, forwarded it to his personal email address and an inoperable external email account; Nichols never informed a supervisor or HR of his actions. Saxon, similarly, after receiving the White Guy Video, forwarded it to his personal email address and never reported his conduct to

supra, Heiserman specifically asked Calvin Bryant to have Lockheed's internal legal department review the preliminary decisions not to fire either Jones or Saxon because Heiserman was "uneasy" about that decision. It is reasonable to infer that Heiserman's uneasiness stemmed from concerns about treating the black employees more favorably, which, in turn, shows that he viewed the cases as indistinguishable.

45

anyone at Lockheed.[72]  Despite Nichols and Saxon's almost analogous conduct,[73]

Heiserman fired Nichols, the white employee, and merely suspended for two weeks

the black employee, Saxon.[74]

_____

[72] Saxon and Nichols (and also Smith, whose conduct was almost identical) likely did not believe that they needed to disclose their actions in forwarding home a racist email. Although Lockheed's zero tolerance policy does impugn all "transmissions" of racist emails—a term that can be read to include the forwarding of a racist email to a personal account—its purpose and spirit suggests a far more limited reach. The policy, a workplace-conduct rule, seeks to prevent employees from engaging in harassing or discriminating conduct to avoid "unreasonabl[e] interfer[ence] with [another] individual's work performance or creating an intimidating, hostile or offensive work environment" for other employees. This language suggests that, to violate the zero tolerance policy, an employee's conduct must somehow injure or put at risk of injury another employee(s). Sending an email home in order to view it privately during off-work hours, without more, does not easily fall within the spirit of such a workplace-conduct rule.

Nichols, consequently, it can be inferred had no notice that, by forwarding the NASCAR email home, he would be found to have engaged in harassing or discriminatory conduct—an inference strengthened by the disciplinary review committee's desire to merely suspend him for such conduct. The same likely holds true for Saxon; the record does not indicate that Saxon, although he knew about Nichols's firing from Ralph Heath's May 9, 2005 letter, ever was aware of precisely to whom Nichols had forwarded the NASCAR email. Without that it is reasonable to conclude that Saxon, too, lacked sufficient notice that simply forwarding an email home was a breach.

[73] The district court noted, and we agree, that Nichols's additional action of attempting to forward the email to another, albeit inoperable, email account was a "minor distinction" between his conduct and Saxon's and thus "insignificant." The district court based this conclusion on the evidence that members of the disciplinary review committee had recognized the fact that Nichols's email was forwarded to a bad email account and had considered it both relevant and favorable to his discipline. In light of these considerations, members of the disciplinary review committee recommended initially that Nichols should receive discipline less severe than termination. See supra notes 44 and 53.

[74] It is reasonable to infer that Saxon's preferential treatment largely was due to the lack of notice the zero tolerance policy provides employees about sending offensive emails to a personal email account for off-work viewing, see supra note 72. Such actions do not clearly violate the zero tolerance policy, which is a workplace-conduct rule aimed at preventing employees' harassment of and discrimination against other employees. Thus, the evidence reasonably suggests that Lockheed HR read the zero tolerance policy broadly in order to punish Nichols, a white employee, for sending the NASCAR email to his personal email account. It

Likewise, the actions of Yerby, DeLeon, and Wood tracked closely with those of Jones, yet the disciplines they received varied distinctively.[75] Yerby, for instance, forwarded the NASCAR email to six Lockheed employees, eighteen people in total, without informing a supervisor or HR of his conduct. Jones similarly forwarded the White Guy Video to eight Lockheed employees. Jones, unlike Yerby, did attempt to correct her misconduct; however, she did so only on the heels of a warning from a friend that the email might offend white employees. Moreover, Jones, in contrast to Yerby, had advance warning that her actions could lead to her termination. That is, Jones made her decision to forward the White Guy Video email despite the fact that she: (1) knew of the firings stemming from the NASCAR-email incident; (2) had received Ralph Heath's May 9, 2005 letter reifying the zero tolerance policy and warning that the company would not tolerate distribution of racially insensitive emails; and (3) had attended training courses on the zero tolerance policy that Lockheed held in response to the NASCAR-email incident. Again, Heiserman fired the white employee, Yerby, but only suspended

---

correspondingly suggests that the same decisionmakers who fired Nichols—including Heiserman—essentially applied a rule of lenity in fashioning discipline for Saxon because they feared that they could not apply the zero tolerance policy in such a draconian way to discipline a black employee without risking new civil rights litigation alleging that his termination was discriminatory.

[75] The district court, in reviewing Yerby's claims, agreed that his conduct was "nearly identical" to Jones's.

the black employee, Jones.

DeLeon and Wood also forwarded the White Guy Video email to several Lockheed employees around the time Jones did. After sending the video, DeLeon and Wood, like Jones, received warnings from recipients that the video might offend some white employees and responded quickly to correct their error.[76] Much like Jones, DeLeon and Wood contacted their recipients to warn of the video's racial content and either to apologize for sending the email or to ask that the email be deleted without viewing.

The record shows that, in response, Lockheed initiated dual, yet coordinated, investigations at the Fort Worth (for DeLeon and Wood) and Marietta (for Jones) plants. Both investigations were overseen by Heiserman, again the final arbiter of all three employees' discipline. In spite of the coordinated nature of the contemporaneous investigations, Heiserman did not credit DeLeon's and Wood's attempts to correct and make apologies for their conduct, yet Heiserman favorably viewed Jones's similar proactive responses in fashioning her discipline. This proved significant, as Heiserman, once again, fired the white employees, DeLeon and Wood, but suspended the black employee, Jones.[77]

---

[76] DeLeon and Wood also had the same benefit of notice that Jones had from the NASCAR-email firings and Heath's May 9, 2005 letter.

[77] Lockheed argues that Wood's and DeLeon's stricter discipline was justified based on their having not self-reported to a supervisor or HR, unlike Jones. This explanation, however, is

The great discrepancies in the punishments received by the white non-supervisors in these cases, in contrast to their black peers, yields a reasonable inference that, in the summer of 2005, Heiserman intentionally discriminated against them because they are white. See, e.g., Osram Sylvania, Inc. v. Teamsters Local Union 528, 87 F.3d 1261, 1265 (11th Cir. 1996) ("Disparate treatment exists when similarly situated workers are treated differently even though they have committed similar acts.").

b.

Mitten was fired at the time Heiserman was committing these reasonably inferrable acts of discrimination against white non-supervisors. Lockheed claims that race, however, had nothing to do with his termination, and that, instead, he was fired because he was employed as a supervisor held to a higher standard of conduct under the zero tolerance policy. A jury certainly could find this justification valid, as the record makes clear that Lockheed, indeed, does impose heightened expectations on supervisors.

Nevertheless, the evidence simultaneously supports the alternative inference

---

quite tenuous—or as the district court stated, "slices the difference very close." Moreover, it fails to explain why Heiserman, and other decisionmakers, saw Jones's responsive actions as exculpatory and DeLeon's and Wood's as irrelevant. The circumstances were so virtually identical, and the investigation and discipline so disparate, that a jury could view it as raising yet another inference of Heiserman's intent to discipline white employees more harshly than black employees.

49

that Lockheed, in this case, is using rank as a pretext for Heiserman's discriminatory motivation for firing Mitten. Because the record lacks any evidence that Lockheed fired a black supervisor for sending racist emails during the summer of 2005,[78] a jury could infer that the racial animus that drove Heiserman to fire the white non-supervisors during this time also led him to fire white supervisors, including Mitten. See Hasan v. Foley & Lardner LLP, 552 F.3d 520, 529 (7th Cir. 2008) (stating that, so long as the evidence is closely related to the plaintiff's circumstances, evidence of "behavior toward or comments directed at other employees in the [same] protected group is one type of circumstantial evidence that can support an inference of discrimination" (internal quotation marks and citations omitted)).

---

[78] Lockheed says that it has fired all supervisors, including black supervisors, for similar violations of the zero tolerance policy. To evidence this, Lockheed points to the firings of two black supervisors in March 2008 for their forwarding of a racist email entitled "Where's My Change?" The inherent weakness with this argument, however, is that, temporally, the firings occurred almost three years after the NASCAR email and White Guy Video incidents. Thus, the same time had elapsed since the ABC News "Primetime Live" special had aired; four years had elapsed since the EEOC had issued its accusatory report; and the civil lawsuits arising from the Meridian shootings were mostly closed, having been adjudicated in Lockheed's favor. As discussed in part III.B.2, infra, these circumstances contribute to a reasonable inference that, in the summer of 2005, Lockheed was intent on disciplining whites more severely if they engaged in conduct that could be viewed as discriminatory, but those pressures were not at play in March 2008. Moreover, the lawsuit before us was ongoing in March 2008. Such exculpatory actions by a defendant already in or facing litigation are "equivocal in purpose, motive, and permanence" and, thus, not a sufficient grounds for summary judgment. Jenkins v. United Gas Corp., 400 F.2d 28, 33 (5th Cir. 1968). Therefore, although Lockheed may apply its zero tolerance policy equally to blacks and whites now, that does not prevent a reasonable inference here—or a potential ultimate finding at trial—that Lockheed discriminated against Mitten.

2.

The inference that Mitten's termination was the result of Heiserman's racial animus toward whites is bolstered further by evidence that Heiserman, during the summer of 2005, had incentive to fire white employees, but not black employees, who engaged in racially discriminatory conduct.[79]

By May 2005, as Heiserman deliberated over how best to discipline Mitten, he faced a considerable dilemma. For nearly two years, he had listened as civil-suit plaintiffs and the federal government accused his staff of tolerating white employees who discriminated against their black coworkers—to such an extent that it led to a race-based mass-shooting tragedy. He also knew that these accusations soon would soon reach a fevered pitch, as ABC News imminently was going to deliver them to a primetime television audience in light highly unflattering to Lockheed and Lockheed management. And, with all this circling in the background, Heiserman now had to address yet another act of white-on-black racism at the company. A jury, in turn, reasonably could infer that Heiserman believed that much rode on how he handled the incident.

That is, a jury reasonably could find that Heiserman recognized that, if he

---

[79] Michael Hester, in investigating DeLeon's and Wood's actions in distributing the White Guy Video email, characterized the video as racist against blacks. It is therefore reasonable to infer that DeLeon's and Wood's actions were viewed by Lockheed as discriminatory against blacks.

were to impose a discipline that appeared too lenient on the white employees guilty of distributing the NASCAR email, the appearance of permissiveness simply would lead to increased economic and public-relations pressures on him,[80] his staff, and the company as a whole. For example, it could be inferred that Heiserman was worried that the plaintiffs in the ongoing and potentially lucrative civil lawsuits would use evidence of a mild discipline for the NASCAR email to bolster their claims that Lockheed HR officials, in much the same way, tolerated Doug Williams's racist ways.

Alternatively, it could be inferred that Heiserman was concerned over Nelson Phillips's quarrelsome and litigious nature. That is, he may have feared that Phillips could respond to a perceived too-lenient punishment by bringing his own civil rights suit, or, as he had many times before threatened to do, an EEOC complaint. If Phillips were to pursue either of these routes, Heiserman likely realized, valuable federal government contracts could be in peril.

Finally, it could be inferred that Heiserman simply anticipated that ABC News would use the new evidence of favorable treatment of white employees to add to its upcoming report's shock value. New reports of tolerance for white-on-black

---

[80] It is reasonable for a jury to infer that Heiserman would face job pressures if his response to the NASCAR email led to backlash. As the man in charge of HR operations and, thus, enforcement of the zero tolerance policy, he likely would be the one held accountable for his staff's showing tolerance for white-on-black racial harassment.

racism would make the incidents in Meridian appear endemic to the whole

company.[81]

In light of such concerns, a jury reasonably could infer that Heiserman felt

inclined to emphatically prove that Lockheed and his staff were committed to

curbing racism aimed at black employees. He chose to do this, it could be inferred

further, by ensuring that all white employees who distributed racist emails were

fired for their conduct.[82] Similar concerns did not, however, factor into his

consideration of discipline for black employees guilty of the same or similar

conduct.

3.

The discipline "matrix," on which Mitten's race was tracked, strengthens the

reasonableness of the inference that Heiserman sought to fire all whites who

distributed racist emails and, thus, fired Mitten because of his race. The

---

[81] As discussed in note 54, supra, the evidence shows that Heiserman, during the course of the NASCAR email investigation, had Meridian on his mind, even referring to the investigation as the "Meridian investigation." This slip, a jury reasonably could infer, was because he was focused on the looming ABC News special on Meridian.

[82] Notably, the district court did not consider how this evidence generated from the fallout from the Meridian shootings—the EEOC report, the ongoing civil litigation, or the ABC News special—might have impacted Heiserman's decision making. Rather, the district court assessed only the effect of the "occurrence of the Meridian tragedy," and whether that, standing alone, raised an inference of discrimination. Because it was an over two-year-old occurrence at a different Lockheed plant, the court found the Meridian shooting spree non-probative of Lockheed's discriminatory intent here. As a consequence, in ruling that Mitten had not raised an inference of discrimination, the court simply ignored his best evidence as to why Lockheed, in the summer of 2005, may been motivated to terminate white, but not black, employees.

disciplinary review committee and Heiserman relied on the "matrix" to reach their

discipline decisions, including Mitten's. On its face, the "matrix" indicates that

race was pertinent to the discipline decisions made, and Lockheed has not explained

satisfactorily why this was legitimate.[83] Therefore, although the district court

entirely ignored this fact,[84] Lockheed's injection of race into its decision-making

---

[83] It plainly defies reason to believe, and a jury, in turn, reasonably could discount, Bryant's implausible claim that race, notwithstanding its presence on the "matrix," was not considered by the disciplinary review committee or Heiserman because those decisionmakers were expected to "close one eye" to the employee's race when looking at the "matrix."

Likewise, Bryant's statement that he recorded race on the "matrix" only to gather that information for later "reporting requirements" has been called into question, as Heiserman and Michael Hester have undermined the validity of Bryant's justification. Heiserman said that there is no "legitimate . . . business purpose for Lockheed to be" monitoring the race of employees in the course of such an investigation. Hester stated that there never would be any reason for HR to report an employee's race during an investigation into, or disciplinary review of, a zero tolerance policy violation. Moreover, a jury could reasonably conclude that the lack of race information on the "matrix" used in investigating Sharron Jones's (and Eric Saxon's) conduct in distributing the White Guy Video email further signifies the dubiousness of Bryant's justification. That is, a jury reasonably could infer that employee race information, if it were necessary to aid future reporting, would have been recorded consistently by Bryant in all cases—in the same way that Bryant consistently noted an employee's rank.

[84] Yet, in the same opinion, the district court found that the "inclusion of race in the spreadsheet contributes to the finding of an issue of fact as to whether race was a consideration in the discipline [Mitten] received." (Emphasis added). The district court made this finding, however, in assessing Yerby's and Nichols's claims at the pretext stage of the McDonnell Douglas framework, and thus after the court had dismissed Mitten's claim.

This ruling is anomalous. As noted in part II, supra, at McDonnell Douglas's third step, the pretext stage, the plaintiff's "burden . . . merges with his ultimate burden of persuading the court that [the plaintiff] has been the victim of intentional discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 256, 101 S. Ct. 1089, 1099, 67 L. Ed. 2d 207 (1981) (citations omitted). Stated simply, a court merely uses the pretext inquiry to guide its determination of the ultimate issue at summary judgment—i.e., whether the evidence yields a reasonable inference of the employer's discrimination. If Lockheed's inclusion of race on the "matrix" raised an inference that Lockheed discriminated against Yerby and Nichols based on their race, the district court should have recognized that it did the same for Mitten.

process yields an unavoidable inference that the employee's race impacted the discipline determination, and it is a jury's province to decide whether race actually bore on the decision to terminate Mitten. See, e.g., Williams v. Lindenwood Univ., 288 F.3d 349, 356 (8th Cir. 2002) ("[I]njecting racial language at all into the decision-making process creates the inference that race had something to do with the decision-making process.").[85]

4.

Based on the totality of the foregoing circumstances, we find that the record contains sufficient circumstantial evidence from which a jury could infer that Lockheed displayed a racially discriminatory animus toward Mitten when it fired him in May 2005. Mitten, consequently, presented a case sufficient to withstand Lockheed's motion for summary judgment. Therefore, the judgment of the district court is VACATED, and the case is REMANDED for further proceedings.

SO ORDERED.

---

[85] Bolstering the reasonableness of this inference is the fact that the matrix composed in the Marietta White Guy Video investigation did not record race. That incident only implicated one white employee, but the investigation revealed that employee had not distributed the email and thus would not be subject to discipline under the zero tolerance policy. Indeed, only two employees—Sharron Jones and Eric Saxon—were found to need disciplining. In light of the small numbers of employees at issue, it could be inferred that race was not tracked because it was already known that both employees to be disciplined, Jones and Saxon, were black and, therefore, would not be terminated for their conduct.