**Jennifer ZOTTOLA, Plaintiff,**

v.

**ANESTHESIA CONSULTANTS OF SAVANNAH, P.C., Defendant.**

**CV 411-154**

United States District Court, S.D. Georgia, Savannah Division.

Signed March 29, 2013

Jack Rosenberg, Atlanta, GA, S. Wesley Woolf, S. Wesley Woolf, PC, Savannah, GA, for Plaintiff.

Maury Bowen, R. Clay Ratterree, Ellis, Painter, Ratterree & Adams, LLP, Savannah, GA, for Defendant.

## ORDER

J. RANDAL HALL, UNITED STATES DISTRICT JUDGE

Presently pending before the Court is Defendant's motion for summary judgment (doc. no. 33) and motion to strike the declaration of Matthew Espinoza (doc. no. 45).

## I. BACKGROUND

### A. Factual Background

#### 1. Plaintiff's Employment with Defendant

This case arises from Plaintiff's termination of employment with Defendant. On March 13, 2006, Plaintiff began her employment with Defendant as an assistant office manager. (Zottola Dep. at 9.) On that same day, Plaintiff executed the Introductory Statement acknowledging that she received, read, and would comply with Defendant's Employment Policies Manual, (*Id.* at 31-32; Doc. no. 30, Ex. 1.) In pertinent part, the employment manual provides that "[i]t is the policy of [Defendant] as a privately held corporation to comply with all laws governing [Defendant's] operations and to conduct its affairs in keeping with the highest moral, legal, and ethical standards. [Defendant] has adopted a zero tolerance for illegal, improper, or unethical behavior." (*See* Doc. no. 30, Ex. 2 at 9; Zottola Dep. at 39–40.) The employment manual further provides that "[a]ny clear infraction of the applicable laws or of recognized ethical business standards will subject a physician or employee to disciplinary action, which may include reprimand, probation, suspension, reduction in salary, demotion, or dismissal, depending on the seriousness of the offense." (Doc. no, 30, Ex. 2 at 9.) Additionally, the employment manual provides that all employment with Defendant is on an "at will basis." (*Id.,* Ex. 1.)

In June 2006, Plaintiff's employment title with Defendant was changed to office manager. (*See* Zottola Dep. at 9–10.) In September 2006, Defendant hired Diane Thistlethwaite to be the practice administrator. (*Id.* at 10.) As practice administrator, Ms. Thistlethwaite was Plaintiff's supervisor. (*Id.* at 88.)

#### 2. Plaintiff's First Maternity Leave

On September 24, 2007, Plaintiff gave birth to her first child. (Zottola Dep. at 63.) Plaintiff intended to take maternity leave until December 17, 2007. (*Id.* at 63–64.) On November 12, 2007, Ms. Thistlethwaite requested that Plaintiff provide her with information on the work Plaintiff performed for Defendant while on maternity leave. (Doc. no. 30, Ex. 4.) Plaintiff cannot recall whether she ever responded to Ms. Thistlethwaite's request. (Zottola Dep. at 44.) On November 19, 2007, Ms. Thistlethwaite asked Plaintiff to come back to work before Plaintiff's planned return date of December 17, 2007. (Zottola Dep. at 65; Zottola Decl. ¶ 30.)

On November 28, 2007, Ms. Thistlethwaite presented Plaintiff with a detailed list of items of concern and for correction regarding Plaintiff's performance of her job duties. (Zottola Dep. at 32; Doc. no. 30, Ex. 5.) Plaintiff understood that she was being asked to correct these items of concern listed on that document. (Zottola Dep. at 34.) On that same day, Ms. Thistlethwaite documented a memorandum to Plaintiff's file regarding the meeting she had with Plaintiff to discuss these items of concern. (*See* Doc. no. 31, Ex. 6.)

At the end of 2007, Plaintiff did not receive a bonus. (Zottola Dep. at 72–73.) Plaintiff was told she did not receive the

2007 year-end bonus due to time discrepancies. (*Id.* at 72.)

### 3. Pregnancy Related Comments

While Plaintiff was employed with Defendant, Ms. Thistlethwaite made several comments about Plaintiff's two pregnancies. In March 2007, in front of Plaintiff and two software vendors, Ms. Thistlethwaite stated that "[Plaintiff] went and got pregnant on me." (Zottola Decl. ¶ 27.) Also, Jamie Hoffman, a former employee of Defendant, states that when she told Ms. Thistlethwaite about Plaintiff's pregnancy, Ms. Thistlethwaite responded with a smirk and replied "Oh great." (Hoffman Decl. ¶ 2.) Additionally, during Plaintiff's 2007 maternity leave, Paula Gower, a former employee of Defendant, states that Ms. Thistlethwaite complained numerous times about the burden that Plaintiff's pregnancy leave placed on Ms. Thistlethwaite. (Gower Decl. ¶ 4.)

On December 10, 2007, after Plaintiff returned from her first maternity leave, Ms. Thistlethwaite posted an advertisement for · Plaintiff's job on savannahjobs.com. (Thistlethwaite Dep. at 66.) Ms. Thistlethwaite intended to replace Plaintiff if she could find a qualified candidate. However, Ms. Thistlethwaite did not find a suitable replacement, and Plaintiff continued in her position as office manager. (*Id.* at 67.) After finding the job posting in January 2008, Plaintiff confronted Ms. Thistlethwaite and offered her resignation. (Zottola Decl. ¶ 5.) Ms. Thistlethwaite told Plaintiff she did not want her to resign, but that Plaintiff had really "dumped on her" because of Plaintiff's 2007 maternity leave absence. (*Id.*; Thistlethwaite Dep. at 66.)

In March 2009, Plaintiff informed Ms. Thistlethwaite that she was pregnant again, to which Ms. Thistlethwaite responded "Well, I don't envy you, that's for sure." (Zottola Decl. ¶ 35.) During this conversation, Plaintiff told Ms. Thistleth-

waite that she "didn't want things to be the way they were last time" in reference to Plaintiff's 2007 maternity leave. (*Id.* ¶ 36.) Ms. Thistlethwaite responded that "we had a lot going on last time, especially with you being out." (*Id.*)

In April 2009, Brandi Deas, a former employee of Defendant, heard another employee ask Ms. Thistlethwaite whether she had heard that Plaintiff was having a baby girl. (Deas Decl. ¶ 2.) Ms. Thistlethwaite responded "Good, maybe she'll be done then!" (*Id.*) Likewise, Ms. Gower heard Ms. Thistlethwaite say in reference to Plaintiff's 2009 pregnancy, "I hope she'll have a girl this time, then maybe she'll stop having babies." (Gower Decl. ¶ 3.)

### 4. QuickBooks Deposits

While employed by Defendant, one of Plaintiff's job responsibilities involved entering daily deposits from the practice into QuickBooks. (*Id.* at 49.) In order to enter the daily deposits into QuickBooks, Plaintiff needed to have a printout from Defendant's online bank accounts. (*Id.* at 49–50.) Plaintiff had full access to Defendant's online bank accounts, possessed the log-in and password for these accounts, and had the ability to print out the daily deposits in order to enter that information into QuickBooks. (*Id.* at 50, 51.)

However, Plaintiff testifies that the customary practice was for Ms. Thistlethwaite to print out the deposit sheets and provide them to Plaintiff to input into QuickBooks. (Zottola Decl. ¶ 21; Zottola Dep. at 58; *see also* Deas Decl. ¶¶ 3, 4; Gower Decl. ¶ 9.) Ms. Thistlethwaite confirms that this was the normal practice. (Thistlethwaite Dep. at 99–100, 130.) Ms. Thistlethwaite, however, contends that the practice changed at the beginning of 2009. (*Id.* at 130.) Ms. Thistlethwaite testifies that in early 2009, she instructed Plaintiff that it was now Plaintiff's responsibility to print the daily deposit sheets from the online bank ac-

counts. (*Id.* at 130–31.) Plaintiff, however, states that there was never a change in policy relieving Ms. Thistlethwaite from the responsibility to provide the deposit sheets to Plaintiff so that they could be entered into QuickBooks. (Zottola Decl. ¶ 22.)

### 5. Plaintiff's Performance Goals

As part of Plaintiff's job, she was instructed to track her job performance goals on a quarterly basis. (Zottola Dep. at 47–48.) Plaintiff created a performance goals spreadsheet and filled this spreadsheet out quarterly to provide to her supervisor. (*Id.* at 48.) One of Plaintiff's performance goals was to input Defendant's daily bank deposits into QuickBooks within two days. (*Id.* at 54.)

Plaintiff filled out such a performance goal spreadsheet relating to the second quarter of 2009 ("Second Quarter 2009 Evaluation"). (*Id.* at 48; Doc. no. 30, Ex. 7.) On the Second Quarter 2009 Evaluation, Plaintiff indicated that she had entered the deposits into QuickBooks on a daily basis. (Zottola Dep. at 48.) Indeed, Plaintiff testifies that she entered the deposits into QuickBooks daily once she received the daily deposits sheets from Ms. Thistlethwaite. (*Id.* at 49.) However, Ms. Thistlethwaite did not provide the deposit sheets to Plaintiff every day, and Plaintiff did not log into the online bank accounts to retrieve the daily deposits if they were not provided. (*Id.* at 58–59.)

On July 31, 2009, at some time between 9:00 a.m. and 4:00 p.m., Plaintiff provided Ms. Thistlethwaite with her Second Quarter 2009 Evaluation. (Jarman Dep. at 100; Zottola Decl. ¶ 25.) When Ms. Thistlethwaite received Plaintiff's performance evaluation, she audited the daily deposits to determine whether they were actually entered daily as indicated by Plaintiff.

(Thistlethwaite Dep. at 178.) Ms. Thistlethwaite's audit indicated that, on average, most of the deposits were not posted to QuickBooks within two days of the deposit date. (*Id.*; Doc. no. 30, Ex. 11.)

### 6. Defendant's Decision to Terminate Plaintiff

On July 31, 2009, after conducting her audit, Ms. Thistlethwaite brought a recommendation for Plaintiff's termination to management. (Jarman Dep. at 22–25; Def.'s Statement of Material Facts ¶ 36.) Specifically, Robert Jarman, M.D., the Vice President of Defendant at the relevant time, made the determination that Plaintiff should be terminated. (Jarman Dep. at 19, 22.) Dr. Jarman, however, made no independent investigation of the reasons for termination and relied solely on Ms. Thistlethwaite's recommendation. (*Id.* at 22–25.) On the same day, Ms. Thistlethwaite also consulted an attorney about Plaintiff's termination.[1] (*Id.* at 125–26.)

On August 7, 2009, Plaintiff was terminated. (Zottola Dep. at 35.) Defendant presented Plaintiff with her separation notice and paid her severance in the amount of $3,428.00. (*Id.*; Doc. no. 30, Ex. 13.) The separation notice indicated that the reason for Plaintiff's termination was that Plaintiff did not perform certain duties in a timely manner. (Doc. no. 30, Ex. 13.)

### 7. Job Advertisement

Defendant contends that on July 31, 2009, the same day that Defendant decided to terminate Plaintiff, Ms. Thistlethwaite also placed a confidential advertisement for Plaintiff's position on savannahjobs.com. Robert Jones, President of savannahjobs.com, states that his records indicate that this job posting was created on July 31, 2009. (Doc. no. 49, Ex. 1.

---

**1.** There are no records of the consultation between Ms. Thistlethwaite and Defendant's counsel regarding Plaintiff's termination. (Jarman Dep. at 136.)

"Jones Aff." ¶ 9.) However, the archived job advertisement contains a "posted on" date of July 13, 2009. (*See* Doc. no. 46, Ex. 1 at 5.) Mr. Jones explains that the website software creates an archived "posted on" date thirty days prior to the expiration date the employee enters into the software. (Jones Dep. at 65–67.) Thus, Mr. Jones states that the July 13, 2009 "posted on" date for the archived job advertisement was created by savannahjobs.com's software after a savannahjobs.com employee manually inserted an "expired at" date of August 12, 2009, the date Ms. Thistlethwaite had requested that the job advertisement be removed. (Jones Aff. ¶ 14.)

However, when Plaintiff's witness, Matthew Espinoza, attempted to create a similar job posting, his efforts were not consistent with Mr. Jones's description of how savannahjobs.com's software works. (*See* Doc. no. 39, Ex. 6.) Mr. Espinoza indicates that on March 20, 2012, he created a job posting advertisement on savannahjobs.com. (Espinoza Decl. ¶ 5.) Although his payment allowed for thirty days of visibility on savannahjobs.com, on March 27, 2012, Mr. Espinoza requested that savannahjobs.com manually expire the job. (*Id.* 6.) After Mr. Espinoza's advertisement was expired by savannahjobs.com, the archived "posted on" date was February 19, 2012, thirty days prior to the date on which Mr. Espinoza originally created the advertisement, March 20, 2012, not thirty days prior to the expiration date like the job posting for Plaintiff's position. (*Id.* ¶ 10.)

When questioned at his deposition regarding Mr. Espinoza's investigation, Mr. Jones indicated that if Mr. Espinoza's job advertisement was manually expired on March 27, 2012, then the date of the archived "posted on" date should have been thirty days prior to March 27. (Jones Dep. at 65–68.) However, Mr. Jones has since clarified the reason for the discrepancy. (Jones Aff. ¶ 17.) In his most recent affidavit, Mr. Jones indicates that the reason the archived "posted on" date varies is because a savannahjobs.com employee manually inputs the expiration date, which the employee randomly chooses. (*Id.*) Depending on the date that the employee chooses for the expiration date, the archived "posted on" date can vary for job advertisements. (*Id.*)

### B. Procedural Background

On June 17, 2011, Plaintiff filed the current lawsuit alleging claims of pregnancy discrimination in violation of Title VII. (Doc. no. 1.) On May 21, 2012, Defendant filed the present motion for summary judgment. (Doc. no. 33.) On September 19, 2012, Defendant filed a motion to strike the declaration of Matthew Espinoza. (Doc. no. 45.)

### III. MOTION TO STRIKE

Before this Court addresses the merits of Defendant's motion for summary judgment, the Court will address Defendant's motion to strike the declaration of Matthew Espinoza and determine whether such evidence is admissible. Defendant seeks to strike Mr. Espinoza's declaration for three reasons. First, Defendant asserts that Mr. Espinoza's declaration is inadmissible expert testimony. Second, Defendant argues that even if Mr. Espinoza's declaration is actually lay opinion testimony, it is inadmissible because it is not based upon first-hand knowledge. Finally, Defendant argues that the probative value of Mr. Espinoza's declaration is substantially outweighed by the danger of confusion, undue delay, and waste of time under Federal Rule of Evidence 403.

In opposition, Plaintiff argues that a motion to strike is an inappropriate vehicle to address the testimony contained in a declaration. Plaintiff also argues that the objection to the declaration is untimely.

Plaintiff asserts that Mr. Espinoza's declaration offers no expert testimony, and it is clear and helpful in this case. Finally, both sides seek fees for their respective roles in litigating this motion to strike. The Court will address each parties' arguments below.

## A. Preliminary Matters

### 1. "Motion to Strike" Standard

Federal Rule of Civil Procedure 12(f) sets forth the standard for motions to strike. "Upon motion made by a party before responding to a pleading ... the court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." As used in the Federal Rules of Civil Procedure, the word "pleading" is a term of art that is limited to "(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a cross-claim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer." Fed. R. Civ. P. 7(a); *see also Mann v. Darden,* No. 2:07–cv–751, 2009 WL 2019588, at *1 (M.D.Ala. July 6, 2009).

■ A declaration in support of a motion for summary judgment is not a pleading and is therefore an inappropriate target of a motion to strike. *Addison v. Ingles Market, Inc.,* No. 3:11–cv–3, 2012 WL 3600844, at *1 (M.D.Ga. Aug. 21, 2012). Indeed, Rule 56 provides that "[a] party may *object* that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2) (emphasis added). Such an objection "functions much as an objection at trial, adjust-

ed for the pretrial setting," and *"[t]here is no need to make a separate motion to strike."* Fed. R. Civ. P. 56 advisory committee's note (emphasis added).

■ "Nonetheless, it is still common for parties to file motions to strike directed at matters that are not contained in pleadings." *Ross v. Corp. of Mercer Univ.,* 506 F.Supp.2d 1325, 1333 (M.D.Ga.2007). In such cases, courts tend to treat motions to strike as objections to the challenged portions of affidavits. *Id.* at 1334. Accordingly, the Court will construe Defendant's motion to strike as evidentiary objections.

### 2. Timeliness of Defendant's Objections

Plaintiff argues that Defendant's objection to Mr. Espinoza's declaration is untimely under the Court's Scheduling Order. Plaintiff points out that Defendant waited eighty-two days from the date the declaration was filed to object to the declaration. Instead of an objection, Plaintiff contends that Defendant's motion is actually another surreply to its motion for summary judgment.

■ The Court notes that Defendant did object to Mr. Espinoza's declaration in its reply brief to its motion for summary judgment. (*See* Doc. no. 43.) In its reply brief, Defendant objected to Mr. Espinoza's declaration on the basis that it was not testimony within the witness's personal knowledge and Mr. Espinoza was never identified as an expert witness. (*See id.* at 3–4.) Essentially, the objections made in its reply brief are the same as the objections brought in Defendant's current motion. As Defendant argues, the motion to strike simply expands upon the objections and clarifies them for the Court.[2] Accord-

---

2. To the extent that Defendant's objection was actually a surreply brief in support of its motion for summary judgment, the timing of the filing of this brief would not preclude the Court from considering it. The failure to

satisfy the notice and timing provisions of Local Rule 7.6 cannot be used by an opposing party to have a brief stricken or not considered. *Podger v. Gulfstream Aerospace Corp.,*

ingly, nothing about the timing of the filing of Defendant's motion will preclude the Court from considering its merits.

### B. Background for Mr. Espinoza's Declaration

Mr. Espinoza's declaration sets forth his investigation regarding the expiration of job advertisements on savannahjobs.com. (*See* Doc. no. 39, Ex. 6.) Mr. Espinoza states that he is employed as the Manager of Creative Technology for TracyLocke and has fifteen years of experience in the technology and development field. (Espinoza Decl. ¶ 3.) As discussed above, Mr. Espinoza's intention in purchasing the job advertisement was to replicate the process used by Ms. Thistlethwaite to post Plaintiff's position with Defendant in July 2009. (*Id.* ¶ 7.) Thus, Mr. Espinoza created a confidential advertisement and then contacted savannahjobs.com to manually expire the advertisement prior to the thirty-day period the advertisement would have otherwise been available to the public. (*Id.*)

Based on this investigation, Mr. Espinoza opines that if a job is manually expired by savannahjobs.com, the "posted on" date of the archived job is not thirty days prior to the manual *expiration* of the job posting. (*Id.* ¶ 11.) Rather, he indicates that the "posted on" date for archived job advertisements is thirty days prior to the date the advertisement is *created*. (*Id.* ¶ 12.) Thus, Mr. Espinoza concludes that the job advertisement for Plaintiff's position with Defendant was created on July 13, 2009 and automatically expired thirty days later on August 12, 2009, thus creating a "posted on" date of July 13, 2009. (*Id.* ¶ 13)

### C. Discussion

Defendant first objects to the declaration of Matthew Espinoza on the grounds that it is inadmissible expert testimony. Plaintiff, however, contends that Mr. Espinoza is not an expert but a lay witness testifying regarding facts and lay opinions.

Federal Rule of Civil Procedure 26(a)(2)(A) provides that "a party must disclose to the other parties the identity of any witness it may use at trial to present [expert] evidence." Additionally, if a witness is retained by a party to provide expert testimony, the party must provide a report containing a complete statement of all opinions and their bases, the facts or data considered by the expert witness, any exhibits to be used by the expert, the expert witness's qualification, a list of all other cases that the witness testified in as an expert during the previous four years, and a statement of the compensation provided for the testimony in the case. Fed. R. Civ. Proc. 26(a)(2)(B).

Plaintiff never identified Mr. Espinoza as an expert and has not provided an expert report for him. If Mr.Espinoza's declaration is expert testimony under Federal Rule of Evidence 702, Plaintiff was required to disclose Mr. Espinoza as a testifying expert pursuant Rule 26(a) and submit an expert report pursuant to the Court's October 17, 2011 Scheduling Order. (*See* Doc. no. 10.)

First, statements numbered one through ten of Mr. Espinoza's declaration are not expert opinion testimony, but factual testimony within Mr. Espinoza's knowledge. In those statements, Mr. Espinoza is not purporting to use any expertise or express any opinions. (*See* Doc. no. 39, Ex. 6.) Rather, Mr. Espinoza merely describes the process he used in purchas-

212 F.R.D. 609,610 (S.D.Ga.2003). Rather, that provision is for the benefit of the Court so

that it may delay issuing an order if it chooses to wait for the brief. *Id.*

ing an advertisement from savannahjobs.com. Indeed, it takes no specialised skill to buy an internet advertisement from a website. The average user of a computer or the internet would have the ability to conduct the type of investigation that Mr. Espinoza describes in statements one through ten of his declaration.

■ Furthermore, although Defendant asserts that Mr. Espinoza's declaration should be excluded under Federal Rule of Evidence 403 because it causes confusion, has no probative value, and causes undue delay, statements numbered one through ten provide probative value as they allow the jury to evaluate the credibility of Mr. Jones's testimony. *See Buckley Towers Condominium, Inc. v. QBE Ins. Corp.*, No. 07–22988–CIV, 2008 WL 5505415, at *2 (S.D.Fla. Oct. 21, 2008) (finding that for impeachment evidence to be admissible, the inquiry is whether there is any logical tendency of a given piece of evidence to make a witness's testimony less credible than it would be absent its introduction). Additionally, these statements would not be confusing to a reasonable juror as they are merely a description of a job advertisement purchase from a website nor would they cause undue delay in this case. Accordingly, Rule 403 provides no basis to exclude Mr. Espinoza's statements numbered one through ten.

■ However, to the extent that statements eleven through thirteen could be considered opinions requiring expert knowledge, these shall be excluded as evidence. Plaintiff did not identify Mr. Espinoza as an expert, provide any qualifications for him, provide an expert report for him, or show that the failure to disclose him was substantially justified. *See* Fed. R.Civ.P. 26(a)(2) & 37(c). Accordingly, under Rule 37(c), there is no basis for this Court to allow Mr. Espinoza's opinions contained in statements numbered eleven through thirteen of his declaration.

■ Plaintiff's argument that statements numbered eleven through thirteen are lay opinions or factual testimony fails. Mr. Espinoza has no first-hand knowledge or observation of the operation of savannahjobs.com sufficient to provide opinions regarding how the website software operates. Mr. Espinoza was never employed by savannahjobs.com nor does he purport to have knowledge of the website beyond the simple "experiment" he conducted as described in his declaration. *See United States v. Marshall*, 173 F.3d 1312, 1315 (11th Cir.1999) (stating the opinion of a lay witness is "admissible only if it is based on first-hand knowledge or observation"). Importantly, he also has no first-hand factual knowledge regarding the date that Ms. Thistlethwaite created the job advertisement for Plaintiff's position. Accordingly, statements numbered eleven through thirteen in Mr. Espinoza's declaration discussing the date the job posting in question was created or the dates that archived jobs on savannahjobs.com show as "posted on" are inadmissible.

## D. Requests for Fees

Both Plaintiff and Defendant seek fees related to the motion to strike. Defendant seeks fees pursuant to Federal Rule of Civil Procedure 56(h). Rule 56(h) provides that if the Court finds that a declaration is submitted in bad faith or solely for delay, the Court may order the submitting party to pay the other party reasonable expenses it incurred as a result. Fed. R. Civ. P. 56(h). Plaintiff seeks fees under 28 U.S.C. § 1927 for unduly prolonging this litigation. (*See* Doc. no. 47 at 9.) After careful review, the Court finds no basis to award fees to either party. Accordingly, the parties' respective requests for fees are **DENIED.**

## E. Conclusion

Based upon the foregoing, Defendant's motion to strike the declaration of Mat-

thew Espinoza (doc. no. 45) is **GRANTED IN PART.** The Court finds that statements numbered eleven through thirteen of Mr. Espinoza's declaration are **INADMISSIBLE** and will not be considered as evidence in this case.

## III. MOTION FOR SUMMARY JUDGMENT

### A. Legal Standard

The Court should grant summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Facts are "material" if they could affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court must view the facts in the light most favorable to the non-moving party, *Matsushita Elec. Indus. Co v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), and must draw "all justifiable inferences in [its] favor." *U.S. v. Four Parcels*, 941 F.2d 1428, 1437 (1991) (internal punctuation and citations omitted).

▮▮▮▮▮ The moving party has the initial burden of showing the Court, by reference to materials on file, the basis for the motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). How to carry this burden depends on who bears the burden of proof at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir.1993). When the non-movant has the burden of proof at trial, the movant may carry the initial burden in one of two ways—by negating an essential element of the non-movant's case or by showing that there is no evidence to prove a fact necessary to the non-movant's case. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 606–08 (11th Cir.1991) (explaining *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celo-*

*tex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).Before the Court can evaluate the non-movant's response in opposition, it must first consider whether the movant has met its initial burden of showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law. *Jones v. City of Columbus*, 120 F.3d 248, 254 (11th Cir.1997) (per curiam). A mere conclusory statement that the non-movant cannot meet the burden at trial is insufficient. *Clark*, 929 F.2d at 608.

▮▮▮▮▮ If—and only if—the movant carries its initial burden, the non-movant may avoid summary judgment only by "demonstrat[ing] that there is indeed a material issue of fact that precludes summary judgment." *Id.* When the non-movant bears the burden of proof at trial, the non-movant must tailor its response to the method by which the movant carried its initial burden. If the movant presents evidence affirmatively negating a material fact, the non-movant "must respond with evidence sufficient to withstand a directed verdict motion at trial on the material fact sought to be negated." *Fitzpatrick*, 2 F.3d at 1116. If the movant shows an absence of evidence on a material fact, the non-movant must either show that the record contains evidence that was "overlooked or ignored" by the movant or "come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency." *id.* at 1116–17. The non-movant cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *See Morris v. Ross*, 663 F.2d 1032, 1033–34 (11th Cir.1981). Rather, the non-movant must respond with affidavits or as otherwise provided by Federal Rule of Civil Procedure 56.

In this action, the Clerk gave Plaintiff appropriate notice of the motion for summary judgment and informed her of the summary judgment rules, the right to file affidavits or other materials in opposition, and the consequences of default. (Doc. no. 34.) Therefore, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822, 825 (11th Cir.1985) (per curiam), are satisfied. The time for filing materials in opposition has expired, and the motion is now ripe for consideration.

## B. Pregnancy Discrimination Claim

■■■■ The Pregnancy Discrimination Act ("PDA"), 42 U.S.C. § 2000e(k), provides that the prohibition against sex-based employment discrimination in § 703(a) of Title VII, 42 U.S.C. § 2000e–2(a), applies with equal force to discrimination on the basis of "pregnancy, childbirth, or related medical conditions." *See* 42 U.S.C. § 2000e(k). Further, the PDA provides that "women affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes... as other persons not so affected but similar in their ability or inability to work." *Id.* The analysis required for a pregnancy discrimination claim is the same type of analysis used in other Title VII sex discrimination suits. *Armstrong v. Flowers Hosp., Inc.,* 33 F.3d 1308, 1312–13 (11th Cir.1994). Disparate treatment discrimination claims brought under Title VII may be established by one of two ways, through the introduction of direct evidence of discrimination or through circumstantial evidence that creates an inference of discrimination. *Standard v. A.B.E.L. Services, Inc.,* 161 F.3d 1318, 1330 (11th Cir.1998).

■■■ In this case, Plaintiff attempts to prove her pregnancy discrimination claim with both direct and circumstantial evidence. If the plaintiff presents direct evidence of discrimination that, if believed by

the jury, would be sufficient to win at trial, summary judgment is not appropriate, even where the employer presents conflicting evidence. *Taylor v. Runyon,* 175 F.3d 861, 867 n. 2 (11th Cir.1999).

### 1. Plaintiff Has Not Identified Direct Evidence Of Pregnancy Discrimination

■■■■ "Direct evidence of employment discrimination is evidence from which a trier of fact could conclude, based on a preponderance of the evidence, that an adverse employment action was taken against the plaintiff on the basis of a protected personal characteristic." *Wright v. Southland Corp.,* 187 F.3d 1287, 1288 (11th Cir.1999). "Evidence that only suggests discrimination, or that is subject to more than one interpretation, does not constitute direct evidence." *Merritt v. Dillard Paper Co.,* 120 F.3d 1181, 1189 (11th Cir. 1997). The evidence, if believed, must prove the existence of the fact in issue without inference or presumption. *See Kilpatrick v. Tyson Foods, Inc.,* 268 Fed. Appx. 860, 862–63 (11th Cir.2008). Thus, "[o]nly the most blatant remarks whose intent could only be to discriminate ... constitute direct evidence." *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1226 (11th Cir.1993).

■■■■ The proffered statements must both "reflect a discriminatory attitude and tie the discriminatory attitude to the relevant employment decision." *Bernstein v. Sephora,* 182 F.Supp.2d 1214, 1217 (S.D.Fla.2002) (citing *Wright,* 187 F.3d at 1294). Furthermore, the biased statement by a decision-maker must be made concurrently with the adverse employment event. *Williamson v. Adventist Health Sys./Sunbelt,* 372 Fed.Appx. 936, 940 (11th Cir.2010) (citing *Damon v. Fleming Supermarkets of Fla.,* 196 F.3d 1354, 1359 (11th Cir.1999)). A biased statement, separate in time from the employment deci-

sion under challenge, is not direct evidence of discrimination. *Id.*

██ Here, Plaintiff puts forth evidence that Ms. Thistlethwaite made several discriminatory comments over a two year period. The last discriminatory comment identified occurred in or around April 2009, but Plaintiff was not terminated until August 7, 2009. Therefore, none of the alleged discriminatory statements were made concurrently with Plaintiff's termination. Furthermore, none of the alleged discriminatory statements meet the high evidentiary standard that requires no inference or presumption of discrimination. *See Wilson v. B/E Aerospace, Inc.,* 376 F.3d 1079, 1086 (11th Cir.2004). Although Ms. Thistlethwaite's numerous derogatory comments regarding Plaintiff's pregnancy may be circumstantial evidence of a discriminatory animus, these comments do not directly establish a discriminatory motive for Plaintiff's termination. *Id.* ("If the alleged statement suggests, but does not prove, a discriminatory motive, then it is circumstantial evidence.")

### 2. *Circumstantial Evidence of Pregnancy Discrimination*

██ In the absence of direct evidence, a plaintiff must establish a prima facie case of discrimination through circumstantial evidence. There is more than one way to show discriminatory intent using indirect or circumstantial evidence. *Hamilton v. Southland Christian Sch., Inc.,* 680 F.3d 1316, 1320 (11th Cir.2012). One way is through the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine,*

450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Another way is "present[ing] circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Smith v. Lockheed–Martin Corp.,* 644 F.3d 1321, 1328 (11th Cir.2011). A triable issue of fact exists if the record, viewed in the light most favorable to the plaintiff, presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination. *See id.* If the plaintiff presents enough circumstantial evidence to raise a reasonable inference of intentional discrimination, her claim will survive summary judgment. *Id.*

██ Defendant contends that Plaintiff has not presented enough circumstantial evidence to raise a reasonable inference of intentional discrimination because she cannot show a non-pregnant comparator who was treated differently. However, Plaintiff does not have to show a comparator if she can show enough non-comparator circumstantial evidence to raise a reasonable inference of intentional discrimination. *See Hamilton,* 680 F.3d at 1320; *see also Smith,* 644 F.3d at 1328 ("[T]he plaintiff's failure to produce a comparator does not necessarily doom [her] case."). Here, the record contains enough non-comparator evidence for a jury to reasonably infer that Defendant discriminated against Plaintiff because she was pregnant. *See Chapter 7 Trustee v. Gate Gourmet, Inc.,* 683 F.3d 1249, 1256 (11th Cir.2012).

#### a) *Discriminatory Comments*

██ The discriminatory comments of Ms. Thistlethwaite are strong circumstantial evidence of a discriminatory intent.[3] A plaintiff can demonstrate a dis-

---

**3.** Although Dr. Jarman testified that he made the decision to terminate Plaintiff, the alleged discriminatory animus of Ms. Thistlethwaite is imputed to Dr. Jarman by the cat's paw theory of liability. The cat's paw theory applies where a plaintiff demonstrates that "the decisionmaker followed the biased recommendation [of a non-decisionmaker] without independently investigating the complaint against the employee." *Stimpson v. Tuscaloosa,* 186 F.3d 1328, 1332 (11th Cir.1999). In

criminatory animus of a decisionmaker by showing that the decisionmaker made discriminatory remarks. *See Damon*, 196 F.3d at 1362 (holding that supervisor's statement that he wanted "aggressive, young men" like himself to be promoted was "highly suggestive circumstantial evidence" of discriminatory animus). A discriminatory statement can be probative as to whether a discriminatory animus motivated the decision to terminate a plaintiff. *Id.* at 1363.

In this case, Ms. Thistlethwaite made several negative remarks regarding Plaintiff's pregnancies from which a reasonable juror could infer a discriminatory animus. Specifically, in 2007, Ms. Thistlethwaite stated that "[Plaintiff] went and got pregnant on me." (Zottola Decl. ¶ 27.) When she heard about Plaintiff's pregnancy, Ms. Thistlethwaite responded with a smirk and replied "Oh great." (Hoffman Decl. ¶ 2.) Additionally, during Plaintiff's 2007 maternity leave, Paula Gower, a former employee of Defendant, states that Ms. Thistlethwaite complained numerous times about the burden that Plaintiff's pregnancy leave placed on Ms. Thistlethwaite. (Gower Decl. ¶ 4.) Finally, after Plaintiff's return from her 2007 pregnancy leave, Ms. Thistlethwaite told Plaintiff that she had really "dumped on her" because of her maternity leave. (Zottola Decl. ¶ 5.)

When Plaintiff informed Ms. Thistlethwaite of her second pregnancy in March of 2009, Ms. Thistlethwaite responded "Well, I don't envy you, that's for sure" and also referenced Plaintiff's 2007 maternity leave by indicating that "we had a lot going on last time, especially with you being out." (*Id.* ¶¶ 35, 36.) In regards to Plaintiff's 2009 pregnancy, Ms. Thistlethwaite also stated that "I hope [Plaintiff will] have a girl this time, then maybe she'll stop having babies!" (Gower Decl. ¶ 3.) Viewed in the light most favorable to Plaintiff, these statements raise a reasonable inference that a discriminatory animus motivated Defendant when it terminated Plaintiff.

b) *Question of Fact Regarding Reason for Plaintiff's Termination*

Plaintiff also presents evidence casting doubt on the veracity of Defendant's purported reason for her termination. *See Smith*, 644 F.3d at 1341 (noting that circumstantial evidence that the employer's offered justification for an adverse employment is pretextual could permit a reasonable jury to infer discriminatory intent). Defendant states that it terminated Plaintiff based upon its zero tolerance policy for providing false information on Plaintiff's 2009 Second Quarter 2009 Evaluation.[4] The performance goal in question required Plaintiff to enter the daily deposit sheets into QuickBooks within two days. (*See* Doc. no. 30, Ex. 7.) On her performance evaluation, Plaintiff indicated she did so daily. Defendant terminated Plaintiff because it found that this representation was

such an instance, "the recommender is using the decisionmaker as a mere conduit, or 'cat's paw' to give effect to the recommender's discriminatory animus." *Id.*

Here, the Court finds that Dr. Jarman did not conduct an independent review sufficient to sever any causal connection between the alleged discriminatory animus of Ms. Thistlethwaite and the decision to terminate Plaintiff. His decision was based entirely on his discussions with Ms. Thistlethwaite. Dr. Jarman did not review Plaintiff's personnel file or otherwise review any other materials in coming to his decision to terminate. (Jarman Dep. at 22–25.) Thus, Ms. Thistlethwaite's alleged discriminatory animus can be attributed to Defendant.

4. To the extent that Defendant argues in its brief that it terminated Plaintiff based upon her past performance history, both Ms. Thistlethwaite and Dr. Jarman testified that Plaintiff's past work history did not contribute to the decision to terminate Plaintiff. (Thistlethwaite Dep. at 154; Jarman Dep. at 114–16.)

inaccurate and that Plaintiff therefore falsified her performance evaluation.

Plaintiff's 2009 Second Quarter Evaluation performance goal stated "Daily Deposits in QB w/in 2 Days." (Doc. no. 30, Ex. 7.) Defendant contends that the performance goal in question meant that Plaintiff should enter the daily deposits into QuickBooks within two days of the deposit being made, while Plaintiff contends that it meant within two days of Ms. Thistlethwaite providing the daily deposit sheets to Plaintiff. (*See* Zottola Decl. ¶ 14; Thistlethwaite Dep. at 179–80.) Indeed, Ms. Thistlethwaite admits that the practice was for her to print the daily deposit sheets and provide them to Plaintiff. (Thistlethwaite Dep. at 99–100, 130.) In opposition, Ms. Thistlethwaite contends that beginning in 2009, she instructed Plaintiff to begin logging in to retrieve the daily deposit sheets herself. (*Id.* at 130–31.)

Plaintiff, however, swears Ms. Thistlethwaite never instructed her to do the daily deposits in this manner. (Zottola Decl. ¶ 22.) Furthermore, Ms. Thistlethwaite testified that she continued to give Plaintiff the daily deposit sheets on occasion in 2009. (Thistlethwaite Dep. at 131.) If Plaintiff was supposed to login to the online bank accounts herself, Ms. Thistlethwaite would not have needed to give Plaintiff daily deposit sheets. This dispute regarding the interpretation of Plaintiff's performance goal creates a question of material fact on whether Plaintiff made a false representation on her performance evaluation. If the jury were to credit Plaintiff's version of the performance goal, Plaintiff did not violate Defendant's zero tolerance policy, and thus Defendant's reason for Plaintiff's termination is pretextual. *See Damon,* 196 F.3d at 1363 (finding that defense that employee was fired for violation of work rules "is arguably pretextual when a plaintiff submits

evidence ... that she did not violate the cited work rule").

Furthermore, Defendant failed to enforce its zero tolerance policy against Plaintiff in previous quarters when she was not pregnant. *See Berg v. Fla. Dep't of Labor and Emp't Sec.,* 163 F.3d 1251, 1255 (11th Cir.1998) (noting that the inconsistent application of an employer's policies can be circumstantial evidence of discrimination). Plaintiff testified that she entered the daily deposits in the same manner the entire time she was employed by Defendant. (*See* Zottola Decl. ¶ 17.) Additionally, every quarterly performance evaluation Plaintiff filled out indicated that she met her performance goal for entering the daily deposits. (*See* Thistlethwaite Dep. at 95–96.) It is somewhat incredible that Ms. Thistlethwaite would determine that Plaintiff lied about her Second Quarter 2009 Evaluation if (1) Plaintiff entered the daily deposits in the manner Ms. Thistlethwaite had implicitly approved for Plaintiff's entire employment with Defendant and (2) Plaintiff filled out her Second Quarter 2009 Evaluation in the same manner as all her previous evaluations.

Indeed, even if Ms. Thistlethwaite told Plaintiff at the beginning of 2009 that it was now Plaintiff's responsibility to retrieve the daily deposits online, Plaintiff violated the zero tolerance policy in at least her First Quarter 2009 Evaluation. (*See* Thistlethwaite Dep. at 95–96.) However, it was not until after Plaintiff told Ms. Thistlethwaite in March 2009 that she was pregnant again that Ms. Thistlethwaite decided to "audit" Plaintiff's self-evaluation for the first time during Plaintiff's employment with Defendant and enforce the zero tolerance policy. (*See id.*)

Finally, the decision to terminate Plaintiff based upon a falsification of her Second Quarter 2009 Evaluation lacks credibility because of its timing. *See Combs v.*

*Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir.1997) (quotation omitted) (noting that a plaintiff can demonstrate that an employer's reason is pretextual by identifying "such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence"). First, Plaintiff's unrebutted testimony indicates that Ms. Thistlethwaite received the performance evaluation between 9:00 a.m. and 4:00 p.m. on July 31, 2009. (Zottola Decl. ¶ 25.) After receiving the evaluation and auditing it, Ms. Thistlethwaite supposedly made a recommendation to Dr. Jarman that Plaintiff be terminated (Jarman Dep. at 29); a conversation between Dr. Jarman and another physician took place (*id.* at 122); at least two meetings with counsel occurred (*id.* at 122, 126); Plaintiff's termination was discussed at a board meeting (*id.* at 43–44); and Ms. Thistlethwaite posted a job advertisement for Plaintiff's position on savannahjobs.com (Jones Aff. ¶ 9).

It is incredible that all of this activity could occur in one day in a busy medical practice. Furthermore, Defendant's board meetings typically occurred on the last Monday of every month, and the board meeting 'closest in time to Plaintiff's termination occurred on Monday, July 27, 2009, four days prior to Plaintiff providing the allegedly falsified performance evaluation to Ms. Thistlethwaite. (*See* Jarman Dep. at 46–47.) This discrepancy casts doubt on whether the termination decision was based upon Plaintiff's Second Quarter 2009 Evaluation. If Ms. Thistlethwaite made the decision to terminate Plaintiff before the non-discriminatory reason arose, then a reasonable juror could find that Defendant did not honestly believe that Plaintiff violated the zero tolerance policy. *See Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir.2002); *Silvera v. Orange Cnty. Sch. Bd.,* 244 F.3d 1253, 1260 (11th Cir.2001).

Thus, considering the evidence of Ms. Thistlethwaite's discriminatory attitude, together with evidence calling into question Defendant's proffered explanation for the termination, the Court finds sufficient circumstantial evidence of pregnancy discrimination to survive Defendant's motion for summary judgment.

### V. CONCLUSION

Based upon the foregoing, Defendant's motion to strike (doc. no. 45) is **GRANTED IN PART** and motion for summary judgment (doc. no. 33) is **DENIED**. This case shall proceed to trial on Plaintiff's pregnancy discrimination claim.

**ORDER ENTERED** at Augusta, Georgia, this *29th* day of March 2013.